**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION, on its own behalf and on behalf of SCOTT FUJITA, ANTHONY HARGROVE, and WILL SMITH, | ) ) ) ) | Case No. |
| | ) | |
| Plaintiffs/Petitioners, | ) | |
| v. | ) ) | **APPLICATION TO VACATE ARBITRATION AWARD** |
| NATIONAL FOOTBALL LEAGUE MANAGEMENT COUNCIL and NATIONAL FOOTBALL LEAGUE, | ) ) ) | |
| | ) | |
| Defendants/Respondents. | ) ) | |

Plaintiff/Petitioner National Football League Players Association ("NFLPA"), on its own behalf and on behalf of Scott Fujita, Anthony Hargrove, and Will Smith (the "Players"), for their Complaint against and Application to Vacate the Arbitration Award issued by Defendants/Respondents the National Football League Management Council ("NFLMC") and the National Football League (collectively, the "NFL" or "League"), allege as follows:

## PRELIMINARY STATEMENT

1.      A seminal question for this Court is whether the NFL Collective Bargaining Agreement (the "CBA") granted the Commissioner, when serving as an arbitrator, the authority to disregard the essence of the parties' agreement, to conduct proceedings that are fundamentally unfair, and to act with evident bias and without jurisdiction.  The answer, under governing case law, is clearly "no."  Accordingly, as demonstrated herein, this is one of the rare cases in which an arbitration award must be set aside.

2.      Plaintiffs/Petitioners Fujita, Hargrove, and Smith are current and former players for the New Orleans Saints.  Several months ago, NFL Commissioner Roger Goodell accused them, along with Jonathan Vilma, another Saints player, of participating in what the League calls a "pay-for-performance/bounty" program, developed, implemented and led by former Saints Defensive Coordinator Gregg Williams.  Coach Williams allegedly encouraged the Players to inflict – and allegedly financially rewarded the Players for inflicting – violent hits in order to injure players on opposing teams.

3.      Commissioner Goodell purported to suspend the Players for this participation – three games for Mr. Fujita, four games for Mr. Smith, and eight games for Mr. Hargrove – thereby putting their 2012 NFL seasons and careers in jeopardy.

4.      The Players categorically denied participating in any type of "bounty" program designed to injure fellow NFL players.  Nor would Plaintiff/Petitioner NFLPA, the union which represents all NFL players, countenance – much less defend – any such behavior.

5.      Since the charges were made, the NFLPA, on behalf of the Players, has tried to utilize the procedures set forth in the CBA to ensure that the Players were afforded a fair process in the appropriate forum to defend themselves against the extremely serious and false accusations made against them.

6.      Unfortunately, the investigation and arbitration process that the Commissioner's public relations machinery touted as "thorough and fair" has, in reality, been a sham.  As set forth below:  (i) the NFL violated express CBA requirements and refused to provide the Players with access to critical documents or witnesses, or anything resembling the fairness mandated by the CBA and governing industrial due process law; (ii) the Players were subject to arbitration before an arbitrator – Commissioner Goodell – who had launched a public campaign defending the punishments he intended to arbitrate, rendering him incurably and "evidently biased"; and (iii) the CBA's System Arbitrator possesses exclusive jurisdiction to arbitrate (and, if warranted, to punish) the "pay-for-performance" conduct charged here, and that jurisdiction was improperly usurped by the Commissioner, whom the NFLPA never agreed could serve as arbitrator under such circumstances.

7.      On July 3, 2012, Commissioner Goodell issued his decision rubber-stamping the Player suspensions he initially levied in early May.  (See Ex. A hereto (the "Commissioner Arbitration Award").)

8.      Governing law requires that the Commissioner Arbitration Award be vacated in its entirety for each one of the identified legal defects:  disregard for the "essence of the CBA" and industrial due process, evident arbitrator partiality, and lack of arbitral jurisdiction.

9.     The NFL has rendered the arbitral process a fraud, refusing to provide the NFLPA with access to relevant evidence or any witnesses, while at the same time utilizing hearsay and innuendo to smear and punish the Players.  Recent events punctuate the reason that the law does not allow an arbitration award issued under such circumstances to stand.  To give one example, Commissioner Goodell, in his role as arbitrator, rejected the NFLPA's request to make New Orleans Saints Coach Joe Vitt available at the arbitration or otherwise.  The Commissioner then nevertheless proceeded to rely upon an NFL lawyer's "summary" of an interview of Coach Vitt – from which the NFLPA was excluded and denied any interview notes – in which Coach Vitt purportedly confirmed the NFL's allegations against the Players.  Shortly after the arbitration, however, when Coach Vitt learned of the statements that the NFL had attributed to him, he publicly and categorically denied the NFL's attributions – saying that he had stressed to NFL investigators from "day one" that the Players had not committed any such wrong.

10.    While Plaintiffs/Petitioners are of the firm conviction that the NFL could not prove its pay-to-injure accusations, to be clear, this litigation does not ask the Court to second-guess the arbitrator on the sufficiency of the NFL's evidence.  Rather, the NFLPA seeks to vacate the Commissioner Arbitration Award on a variety of well-established legal grounds relating to the sham process from which it was born, rendering the Award legally invalid.

11.    The Players sought – and were legally entitled to – an arbitral process that was transparent, credible and fair.  It becomes more apparent with each passing day, however, that the NFL's objective was not to follow the CBA and provide a fair process, but to validate a biased investigation and to deprive the Players of any meaningful ability to defend themselves against a pre-ordained result.

12.     The Players have suffered, and are suffering, irreparable and grievous injury with each day the Commissioner Arbitration Award and punishments against them are permitted to stand. Established principles of labor and arbitration law require that the Award be set aside.[1]

## JURISDICTION AND VENUE

13.     This is an action pursuant to Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, to vacate the Commissioner Arbitration Award.  This Court has subject matter jurisdiction in this action pursuant to 28 U.S.C. § 1331.

14.     The New Orleans Saints, one of the 32 franchises in the NFL, is headquartered in New Orleans, Louisiana, and does business in this district, where it is headquartered.  The NFL derives revenue from throughout the State of Louisiana through advertising, ticket sales, merchandising and broadcast revenue and is subject to personal jurisdiction here.

15.     Venue is proper in this court under 28 U.S.C. § 1391 and 29 U.S.C. § 185.  Most of the events underlying the Commissioner Arbitration Award occurred in this judicial district.  In addition, two related cases – Vilma v. Goodell, Civ. No. 12-cv-1283, and Vilma v. National Football League, Civ. No. 12-cv-1718 – are already pending before the Court.

16.     Further, on June 28, 2012, the NFLPA advised the NFL in writing that if the Commissioner proceeded to issue a decision and uphold his discipline the Players would seek to set aside the arbitration award in the Eastern District of Louisiana

## PARTIES

17.     Plaintiff/Petitioner NFLPA is a non-profit corporation duly organized and existing under the laws of the Commonwealth of Virginia and is the union and exclusive collective bargaining

---

[1] As detailed below, the NFLPA has challenged the Commissioner's exercise of purported arbitral jurisdiction before a CBA Appeals Panel.  The Commissioner, however, refused the NFLPA's request to stay his arbitration while that appeal was heard.  With the NFL now treating the Players' suspensions as "final," the NFLPA had no choice but to immediately present its jurisdictional challenge to the Court, which in any event is reviewed de novo.

representative of all NFL players.  Plaintiff/Petitioner NFLPA's offices are located at 1133 20th Street, N.W., Washington D.C., 20036.

18.     Scott Fujita is a professional football player and is a member of the NFLPA.  Mr. Fujita played for the New Orleans Saints from 2006 to 2009.

19.     Anthony Hargrove is a professional football player and is a member of the NFLPA.  Mr. Hargrove played for the New Orleans Saints from 2009 to 2010.

20.     Will Smith is a professional football player and is a member of the NFLPA.  Mr. Smith has played for the New Orleans Saints since 2004.

21.     Defendant/Respondent the National Football League maintains its offices at 345 Park Avenue, New York, New York, 10154, and is an unincorporated association consisting of 32 separately-owned and operated professional football teams.

22.     Defendant/Respondent NFLMC is the exclusive bargaining representative of present and future employer member clubs of the NFL, including the Saints.

23.     Roger Goodell is the Commissioner of the NFL, the League's chief executive.  He is also a designated arbitrator under the CBA for certain limited areas of player discipline, referred to as "conduct detrimental," under Article 46 of the CBA.  The arbitral award at issue was rendered by Commissioner Goodell as a purported exercise of his authority under Article 46 – an assertion which, as discussed below, the Players challenge as an improper usurpation of another arbitrator's jurisdiction.

**STATEMENT OF FACTS AND PROCEDURAL HISTORY**

**I.      ARBITRATION UNDER THE NFL COLLECTIVE BARGAINING AGREEMENT**

24.     The parties are bound by the CBA negotiated between the NFLMC, on behalf of the NFL member teams, and the NFLPA, on behalf of all NFL players.  The current CBA was signed on

August 4, 2011.  True and correct copies of the CBA provisions relevant to this dispute are attached hereto as Ex. B.

25.     The CBA sets forth a comprehensive arbitration system, identifying at least seven different types of arbitrators, each vested with jurisdiction to preside over disputes arising out of specified provisions among the CBA's 71 Articles.

**A.     System Arbitrator Proceedings**

26.     One of the CBA's arbitrators is the System Arbitrator, who is broadly vested with "exclusive" jurisdiction to enforce the terms of 23 different CBA Articles.  (See Ex. B, CBA, Art. 15, § 1 (granting the System Arbitrator "exclusive" jurisdiction to enforce the terms of CBA Articles 1, 4, 6-19, 26-28, 31, or 68-70).)  Relevant here, the System Arbitrator's exclusive jurisdiction covers Article 14 of the CBA, which prohibits undisclosed pay-for-performance agreements involving a Club and players (sometimes referred to as "non-contract" agreements):

> A Club (or a Club Affiliate) and a player (or a Player Affiliate or player agent) may not, at any time, enter into undisclosed agreements of any kind, express or implied, oral or written, or promises, undertakings, representations, commitments, inducements, assurances of intent, or understandings of any kind: (a) involving consideration of any kind to be paid, furnished or made available or guaranteed to the player, or Player Affiliate, by the Club or Club Affiliate either prior to, during, or after the term of the Player Contract . . . .

(Id., Art. 14, § 1.)  Thus, a program in which a Club makes non-contract payments available to players falls within the System Arbitrator's exclusive jurisdiction.

27.     The CBA is crystal clear that <u>only</u> the System Arbitrator may penalize players for alleged violations of the CBA's ban on undisclosed, pay-for-performance agreements.  (See id., Art. 14, § 6(a).)  This is in contrast to penalties against Club employees for the same conduct, for which the CBA authorizes the Commissioner to impose fines and suspensions.  (See id., Art. 14, § 6(b) (providing that the Commissioner may punish "Club personnel" after the System Arbitrator has found

a violation and clarifying that, "[f]or purposes of this Subsection 6(b), the term 'Club personnel' shall not include players").)

28.     In a System Arbitration proceeding, the parties may seek "reasonable and expedited discovery," including "the production of documents and the taking of depositions." (Id., Art. 15, § 3.)

29.     Currently, Professor Stephen B. Burbank, the David Berger Professor for the Administration of Justice at the University of Pennsylvania Law School, serves as System Arbitrator. Professor Burbank is a neutral arbitrator who was jointly appointed by the parties.  Most of the other CBA Articles are also subject to neutral arbitration before the Non-Injury Grievance Arbitrator, the Injury Grievance Arbitrator, the Impartial Arbitrator, the Hearing Officers or other neutrals jointly appointed by the NFLPA and the NFLMC.  (See id., Arts. 43, 44, 16, and 46, § 2(a), respectively.)

**B.     Commissioner Arbitration Proceedings**

30.     In certain very limited circumstances, the CBA provides that the Commissioner may serve as an arbitrator.  In contrast to the broad jurisdiction of the System Arbitrator, the Commissioner's arbitral powers are limited to "conduct detrimental" arising under a single CBA provision (Article 46, Section 1(a)):

> All disputes involving a fine or suspension imposed upon a player for conduct on the playing field (other than as described in Subsection (b) below) or involving action taken against a player by the Commissioner for conduct detrimental to the integrity of, or public confidence in, the game of professional football, will be processed exclusively as follows: the Commissioner will promptly send written notice of his action to the player, with a copy to the NFLPA.  Within three (3) business days following such written notification, the player affected thereby, or the NFLPA with the player's approval, may appeal in writing to the Commissioner.

31.     Significantly, the CBA carves out from the "conduct detrimental" the Commissioner may arbitrate "unnecessary roughness or unsportsmanlike conduct on the playing field with respect to an opposing player."  (Id., Art. 46, § 1(b).)  Appeals of discipline imposed for the latter conduct (such as a violent hit) are heard by neutral Hearing Officers selected by the parties.  (Id., Art. 46, § 2(a).)

8

32.     The type of "conduct detrimental" that the Commissioner <u>may</u> properly punish and arbitrate includes behavior such as betting on or "fixing" an NFL game or violating other criminal or similar laws.

33.     Even in situations where the Commissioner has jurisdiction to arbitrate an appeal of a punishment he has imposed (Plaintiffs/Petitioners believe the Commissioner has no such jurisdiction here), the CBA expressly guarantees players a right to a hearing with counsel of their choosing, three days before which the NFL must disclose any and all exhibits it intends to rely upon to support the imposition of the discipline.   (<u>See</u> <u>id.</u>, Art. 46, § 2(f)(ii).)   Significantly, the CBA also expressly provides that non-disclosure of exhibits means such exhibits cannot form the basis of any discipline. (<u>Id.</u>)

34.     In addition, even a Commissioner-adjudicated arbitration must comport with established principles of industrial due process and basic fairness – including disclosure of exculpatory information and the presentation of live witness testimony by a party's accusers.  The law is unambiguous that commissioners of sports leagues do not have carte blanche to proceed at their whim when serving as arbitrators; rather, they must comport with the required arbitral standards of evident impartiality and fundamental fairness when dealing with each case before them.

## II.    <u>THE ALLEGED "PAY-FOR-PERFORMANCE/BOUNTY" SYSTEM</u>

35.     On March 2, 2012, NFL Security issued a report summarizing "the findings of [its] lengthy investigation" into alleged "pay-for-performance/bounty" payments claimed to have been made to certain New Orleans Saints players during the 2009, 2010, and 2011 NFL seasons. (NFL Security Report at 1, attached hereto as Ex. C.)

36.     The NFL Security Report states that the Commissioner's investigation uncovered a "Pay-for-Performance" program, developed and administered principally by Saints coaches,

involving the distribution of payments to certain players in violation of "long-standing league rules" prohibiting non-contract bonuses.  (Id. at 3.)

37.     Administered and funded in part by Coach Williams (the Saints former Defensive Coordinator), the NFL alleges that players received "improper cash payments" for both legitimate defensive plays and hits on opposing players intended to cause injury.  (Id. at 2, 4.)

38.     The NFL Security Report concludes:  "a bounty program of this type violates long-standing league rules.  Payments of the type made here – even for legitimate plays such as interceptions or fumble recoveries – are forbidden because they are inconsistent with the [CBA] and well-accepted rules relating to NFL player contracts."  (Id. at 3.)  Indeed, the NFL's "pay-for-performance" allegations fall squarely into the System Arbitrator's – not the Commissioner's – exclusive jurisdiction to arbitrate and then punish players for any pay-for-performance agreements outside of a player contract if a violation is proven.

**III.     THE COMMISSIONER'S PURPORTED DISCIPLINE**

     **A.     Saints Coaches And Management Are Punished For Establishing
         And Directing The Alleged "Pay-For-Performance/Bounty" System**

39.     On March 21, 2012, Commissioner Goodell suspended various members of the Saints management and coaching staff for "design[ing]," "implement[ing]," "operat[ing]," "contribut[ing] to," facilitating, and deliberately concealing the alleged "pay-for-performance/bounty" program. (See Memorandum of Decision, March 21, 2012, attached hereto as Ex. D.)[2]

---

[2] Head Coach Sean Payton was suspended without pay for the 2012 NFL Season; General Manager Mickey Loomis was suspended without pay for 8 regular season games and fined such that total forfeited pay would equal $500,000; Coach Williams was suspended indefinitely from further employment in the NFL; and Assistant Head Coach Joe Vitt was suspended for 6 games and fined such that total forfeited pay would equal $100,000.  In addition, the Saints franchise was fined $500,000.  (Ex. D, Memorandum at 6-7.)

40.     The bases for and specifics of the discipline were set forth in a Memorandum of Decision ("Memorandum"), the primary focus of which, like the NFL Security Report, is on "the longstanding rule against non-contract bonuses . . . ." (Id. at 4.)

41.     For example, the Memorandum highlights the CBA's prohibition on non-contract payments, and includes a new directive to each NFL owner to "confirm after due inquiry that his club does not operate any program of pay for performance, bounties, or other non-contract bonuses . . . [as] any such program violates league rules . . . and is impermissible." (Id. at 7.)  The Memorandum indicated that punishment of players would be addressed "at a later time." (Id. at 8.)

42.     Following issuance of the Security Report and the Memorandum, the NFLPA requested documents or other evidence from the Commissioner regarding any allegations against Messrs. Fujita, Hargrove, and Smith (whom the NFL had asked to interview).  (See Letters from Heather M. McPhee to Jeff Pash regarding Fujita, Hargrove, and Smith at 1, Apr. 9, 2012, attached hereto as Ex. E.)

43.     The NFL responded that it was "clearly . . . under no obligation to provide further information.  More important, we do not believe it is appropriate to make any material available beyond that which was already provided to the Players Association, and therefore we decline to do so."  (Letters from Adolpho A. Birch III to Heather M. McPhee regarding Fujita, Hargrove, and Smith at 1, Apr. 11, 2012, attached hereto as Ex. F.)

**B.     The Commissioner Suspends The Players**

44.     On May 2, 2012, the NFL imposed discipline on Messrs. Fujita, Hargrove, and Smith (as well as Mr. Vilma) for their alleged roles in the "pay-for-performance/bounty" program.  (See Letters from Commissioner Goodell to Scott Fujita, Anthony Hargrove, and Will Smith, May 2, 2012 ("Player Discipline Letters"), attached hereto as Exs. G, H, and I, respectively.)

45.    The Commissioner purported to suspend Mr. Fujita without pay for 3 games for allegedly "pledg[ing] a significant amount of money to the pool during the 2009 NFL Playoffs" (Ex. G, Fujita Discipline Letter at 1-2); Mr. Hargrove without pay for 8 games for allegedly "actively participat[ing]" in the program and for "intentionally obstruct[ing] the league's investigation into the program by being untruthful to investigators" (Ex. H, Hargrove Discipline Letter at 1-2); and Mr. Smith without pay for 4 games for allegedly "assist[ing] Coach Williams in establishing and funding the program" and "pledg[ing] significant sums during the 2009 playoffs toward the program pool for cart-offs and knockouts of Saints' opposing players" (Ex. I, Smith Discipline Letter at 1-2).

46.    Each Discipline Letter cited the March 2, 2012 NFL Security Report and the March 21, 2012 Memorandum of Decision as "set[ting] forth the key facts relating to the bounty program." (Player Discipline Letters at 1.)

## IV.    THE COMMISSIONER LAUNCHES A PUBLIC CAMPAIGN TO DEFEND HIS DISCIPLINE DESPITE INTENDING TO SERVE AS THE ARBITRATOR OF THAT DISCIPLINE

47.    After announcing his intention to discipline the Players, but before the arbitration commenced before him, Commissioner Goodell made a calculated decision to begin making public comments defending his discipline and arguing about the importance of upholding the severe Player punishments which he planned to impose.  In the process, he abandoned all notions of arbitral propriety and cast himself in a role in which he could not possibly serve as the arbitrator of the discipline without being considered evidently partial and incapable of rendering a fair arbitral ruling.

48.    For example, Commissioner Goodell told the public that the discipline he imposed on the Players was "unprecedented" and was done specifically with the purpose of sending a message to other players, telling the media, "I hope by the actions that have been taken here that the fact that we discovered it, and the fact that we penalized it with unprecedented discipline, and by the focus that it's gotten, that people understand not to engage in that."  Peter King, <u>Analyzing Tomlinson's career,</u>

*Saints' appeal, Banks' comeback*, SI.com, June 18, 2012;[3] see also Press Release, NFL, Four Players Suspended for Participation in Saints' Pay-for-Performance/Bounty Program (May 2, 2012) ("The evidence clearly showed that the players being held accountable today willingly and enthusiastically embraced the bounty program.").[4]  He even appeared on television to defend his discipline.  See, e.g., Roger Goodell, NFL Commissioner, Press Conference at Owners Meeting (May 22, 2012) ("[You've got] the Saints on one side, you've got 31 other teams [on the other].  What I've got to do is what is in the best interests of the game long term . . . [w]e've been very clear about our priorities for player health and safety.").[5]

        49.  Prior to rendering his decision as an arbitrator, Commissioner Goodell repeatedly lauded the discipline that he had imposed at the Players' expense, telling the media that "we do want to make sure that at every point we uphold the standards that our fans expect."  Goodell confident that bounty hunting no longer issue, SI.com, May 31, 2012.[6]

        49.     In fact, Commissioner Goodell publicly proclaimed the Players' guilt even before issuing his discipline, telling the media, "the evidence is quite clear that the players embraced this.  They enthusiastically embraced it.  They put the vast majority of the money into the program and they actually are the ones playing the game."  Interview by Rich Eisen with Roger Goodell, NFL Commissioner (Apr. 24, 2012);[7] see also Press Release, NFL, Four Players Suspended, supra ("Saints players of their own accord pledged significant amounts of their own money toward bounties . . .

_____

[3] http://sportsillustrated.cnn.com/2012/writers/peter_king/06/18/mmqb/index.html.

[4] available at http://nfllabor.files.wordpress.com/2012/05/5-2-12-saints-players1.pdf.

[5] See http://www.nola.com/saints/index.ssf/2012/05/nfl_commissioner_roger_goodell_25.html.

[6] http://sportsillustrated.cnn.com/2012/football/nfl/05/31/roger.goodell.bounty.ap/index.html.

[7] See Doug Farrar, Saints close to knowing further punishment, but dysfunction keeps growing, Yahoo! Sports, Apr. 24, 2012, http://sports.yahoo.com/blogs/nfl-shutdown-corner/saints-close-knowing-further-bounty-punishment-franchise-dysfunction-223808859.html.

accepted payments for 'cart-offs' and 'knockouts' of injured opposing players, and that the payout amounts doubled and tripled for playoff games."). The Commissioner stated that he was "profoundly troubled by the fact that players – including leaders among the defensive players – embraced this program so enthusiastically and participated with what appears to have been a deliberate lack of concern for the well-being of their fellow players." Press Release, NFL, NFL announces management discipline in Saints' "bounty" matter (Mar. 21, 2012).[8]

50.     Any reasonably objective person who considered Commissioner Goodell's public statements would conclude that he could not serve as an impartial arbitrator on the matter of player discipline for the alleged "bounty" system because he had pre-ordained the outcome and was evidently biased on this particular subject.

## V.     THE NFLPA SEEKS A NEUTRAL SYSTEM ARBITRATION

51.     One day after Commissioner Goodell issued the Player Discipline Letters, the NFLPA initiated a proceeding before System Arbitrator Burbank. The NFLPA contended that, even taking the Commissioner's discipline at face value for the purposes of the System Arbitration, it was expressly based on "pay-for-performance" conduct within the exclusive arbitral jurisdiction of the System Arbitrator. (See Letter from Jeffrey Kessler to Stephen Burbank, May 3, 2012, attached hereto as Ex. J.)

52.     Specifically, the NFLPA contended – and contends now before the Court – that the Commissioner may not usurp the System Arbitrator's exclusive jurisdiction over "pay-for-performance" behavior merely by calling it "conduct detrimental" to the League. (Id. at 7.) Otherwise, the Commissioner's very narrow and agreed upon authority to serve as an arbitrator – which the parties confined to Article 46, Section 1(a) of the CBA – could become unbounded simply

---

[8] available at http://www.nfl.com/news/story/09000d5d827c15b2/article/nfl-announces-management-discipline-in-saints-bounty-matter.

by the Commissioner recasting any behavior he wishes to arbitrate as "conduct detrimental." The NFLPA and the Players did not agree to arbitrate before the Commissioner in such circumstances.

53.     On June 4, 2012, the System Arbitrator erroneously deferred jurisdiction to the Commissioner, finding that the Players' alleged roles in a Saints "pay-for-performance/bounty" program were outside of his jurisdiction to enforce Article 14, Section 1.  (See Op. of System Arbitrator Stephen Burbank at 7, June 4, 2012 ("System Arbitration Award"), attached hereto as Ex. K.)

54.     System Arbitrator Burbank based his decision not on any point briefed or argued by the parties, but upon an arbitrary distinction of his own creation that appears nowhere in the CBA. Specifically, the System Arbitrator concluded that he had exclusive jurisdiction over players receiving money from the alleged "pay-for-performance/bounty" pool, but not over players allegedly paying money into such a pool.  (See id. at 7-9.)  This distinction cannot be justified by the CBA nor can it override the fact that the NFLPA has never agreed to arbitrate these types of disputes before the Commissioner.

55.     The NFLPA has appealed the System Arbitration Award to the Appeals Panel provided for in the CBA.  The Appeals Panel, however, has not yet been constituted.  The NFLPA asked the Commissioner to wait until the parties selected members of the Appeals Panel and exhausted the CBA procedures before deciding whether there was any basis on which to conduct a Commissioner arbitration, but he refused to do so.  Instead, the Commissioner proceeded to conduct an arbitration over the NFLPA's and the Players' objections that he lacked arbitral jurisdiction or agreement to do so.

56.     As discussed below, the Court reviews the question of arbitrability before the Commissioner de novo.  The System Arbitrator's decision is erroneous in that it defers jurisdiction to

the Commissioner in a manner contrary to the CBA's clear mandate that any alleged "pay-for-performance" agreement is subject exclusively to neutral arbitration before the System Arbitrator.

## VI.    THE COMMISSIONER REFUSES TO SHARE CRITICAL INFORMATION WITH THE NFLPA WHILE PUBLICLY PROMOTING HIS INVESTIGATION AS "THOROUGH AND FAIR"

### A.    The NFL Holds A Press Conference About Its Investigation

57.    In May 2012, the NFL announced that it had retained former prosecutor Mary Jo White to conduct a purportedly "independent" investigation of the bounty allegations which were the predicate for the Commissioner's discipline of the Players.  Ms. White announced that she had reviewed more than 18,000 documents that the NFL had collected concerning the alleged "pay-for-performance" bounty system, as well as reports from "multiple, independent first-hand accounts." (Tr. of Player Discipline Conference Call with Mary Jo White, May 3, 2012, attached hereto as Ex. L.)

58.    In a conference call with the press on May 3, 2012, Ms. White told reporters that there was evidence of actual bounty payments but declined to elaborate further on the factual underpinnings of her conclusion.  (Id. at 5.)  Nevertheless, she described the investigation as a "very thorough, fair and robust process," and stated that the punishments arose from "very strong corroborating evidence."  (Id. at 1.)

59.    Ms. White repeatedly lauded the strength of the evidence against the Players, stating that "[t]he factual basis for the sanctions is quite strong in my opinion." (Id.)  But despite her report of first-hand accounts and corroborating evidence, Ms. White claimed that it would be improper to reveal sources of information and that the identities of the individuals who provided information would be kept secret.  (Id. at 3.)

**B.      The NFLPA Conditionally Appeals The Commissioner's Discipline
And Makes Repeated Requests For Access To Critical Information**

60.     On May 7, 2012, the Players commenced an appeal of the Commissioner's discipline, while explicitly reserving the right to contest his jurisdiction and to challenge his authority to conduct the arbitral hearing.  (See Letter from Richard A. Berthelsen to Commissioner Goodell at 1, 2, May 7, 2012, attached hereto as Ex. M.)  The hearing was scheduled for June 18.

61.     As part of the arbitration before the Commissioner, the NFLPA asked the NFL to make relevant witnesses and documents available for the arbitral hearing, including:

- Current and former Saints Coaches Sean Payton, Gregg Williams, Joe Vitt and Michael Cerullo; NFL Security personnel Joe Hummel and Jeffrey Miller;

- Potentially exculpatory documents;

- Documents purportedly supporting the Commissioner's findings with respect to each player as set forth in the Player Discipline Letters; and

- Documents obtained from, or belonging to, any of the Players.

(See Letter from Heather M. McPhee to Commissioner Roger Goodell at 1, June 11, 2012, attached hereto as Ex. N; see also Letter from Heather M. McPhee to Roger Goodell at 1, June 14, 2012, attached hereto as Ex. O (requesting, among other things, documents concerning the NFL's interview of Duke Naipohn, a witness to many Saints defensive meetings, and documents indicating that Coach Williams's inflammatory speeches were not intended to be perceived by players as literal instructions to intentionally injure opposing players).)

62.     The NFL responded that the CBA did not require it to disclose any exhibits other than those the NFL would choose to rely upon at the arbitral hearing.  (See Letter from Adolpho A. Birch III to Heather M. McPhee at 1, June 15, 2012, attached hereto as Ex. P.)  Thus, according to the NFL, it had no obligation to produce any witnesses, to disclose any exculpatory evidence, to produce all of the documents it had reviewed, or to even let the Players confront and cross-examine their accusers.  Indeed, the NFL refused to make available any first-hand witnesses to the events at issue –

i.e., the very individuals whose testimony purportedly provided the basis for the Commissioner's discipline.

**C.      The NFL's Shockingly Sparse Pre-Hearing Disclosures**

63.      After boasting, as part of its public relations campaign, of reviewing "more than 18,000 documents," and notwithstanding the NFL's express CBA obligation to disclose copies of any exhibits on which the Commissioner intended to rely, on June 15, 2012, the NFL produced to the NFLPA a paltry sixteen exhibits consisting of approximately 200 pages.[9]  (See NFL Exhibits Produced June 15, 2012, attached hereto as Ex. Q.)  The NFL's document production was not only sparse, it was mostly irrelevant to the Commissioner's discipline findings and included news articles and a blog posting that were published or posted five weeks after the Commissioner issued the Discipline Letters.

64.      In its cover letter, the NFL informed the NFLPA that it would produce only one witness at the hearing – a representative of the NFL Security Department.  (Ex. P, June 15 Letter from Birch.)  In other words, the NFL would not produce Coach Williams, Coach Vitt or any other witness who could possibly authenticate and explain the NFL's cryptic and not easily interpretable documents.  Nor would the NFL produce a single eye witness to testify about any of the alleged events, depriving the Players of any opportunity to cross-examine their accusers or to elicit exculpatory testimony from such witnesses.  And there can be no question that the NFL had the ability to compel the attendance of these individuals – as evidenced by the fact that the NFL was able to provide itself access to these individuals when it served the NFL's own purposes.  To this day, the NFLPA does not know who created the NFL's exhibits, for what purpose they were created, or whether they have been shown to any players or coaches.

---

[9] Although the CBA requires disclosure at least three calendar days prior to a Commissioner arbitration (CBA, Art. 46, § 2(f)(ii)), the NFL did not comport with that requirement either – instead producing their meager production less than 72 hours prior to the hearing.

65.    In addition, several of the NFL's exhibits consisted of purported transcriptions of handwritten notes.  (See Ex. Q, NFL Exhibits at NFLSL00154 (Ex. 1), NFLSL00155 (Ex. 7), NFLSL00156 (Ex. 10).)  The NFL, however, did not produce copies of the actual handwritten notes, information about how, when or why they were transcribed, or who transcribed or authored them.

66.    In view of these egregious deficiencies, the NFLPA asked the Commissioner for a three or four day adjournment of the hearing.  (Letter from Heather M. McPhee to Commissioner Roger Goodell at 1, June 15, 2012, attached hereto as Ex. R.)  The NFL denied that request too. (Letter from Adolpho A. Birch III to Heather M. McPhee at 1, June 16, 2012, attached hereto as Ex. S.)

## VII.    THE SHAM ARBITRATION BEFORE COMMISSIONER GOODELL

67.    At the June 18 arbitration hearing, the NFL announced that it would proceed with its case against the Players not by introducing any evidence – but instead by having its outside counsel (Ms. White) – present a slideshow summary (i.e., a lawyer's argument).  (Tr. of Commissioner Arbitration Hr'g at 5:4-14, June 18, 2012 ("Goodell Hr'g Tr."), attached hereto as Ex. T.)

68.    Counsel for the NFLPA stated that Plaintiffs/Petitioners would not participate in the merits of the hearing in order to preserve their objection that the Commissioner lacks jurisdiction to punish or arbitrate the alleged conduct.  (Id. at 16:12-23.)  In addition, counsel for the NFLPA objected to, among other things:  the Commissioner's failure to comply with CBA procedures or requirements of industrial due process and fairness; and the Commissioner's refusal to consider any mitigating factors, including, in particular, the fact that the Commissioner himself had concluded that Saints coaches, i.e., the Players' supervisors, had directed the alleged conduct at issue.  (See id. at 16:12-26:11.)

69.     The Players also made a formal motion that the Commissioner recuse himself from the proceedings due to evident bias. (Id. at 18:18-19:12.)  This motion was taken under submission by the NFL for decision "at a later time." (Id. at 35:24-36:3.)

70.     The NFL's outside counsel then presented a slideshow, with periodic question-and-answer with NFL Security representative Jeffrey Miller, summarizing the NFL's evidence as to the alleged existence of the "pay-for-performance" program in general and as to each player's alleged role in the program.  (Id. at 44:25-85:11.)  Not a single eye witness to any of the alleged events was produced.   Moreover, the presentation repeatedly referred to many requested but unproduced documents and information, such as handwritten notes, purported witness statements and undisclosed "forensic evidence" which was not made available to the NFLPA or the Players.  (Id. at 85:16-86:18.)

71.     Counsel for the NFL noted the League's deliberate decision to keep sources anonymous, "in order to safeguard their identities," stating that many would be referred to only "by their function and/or their relationship to the New Orleans Saints."  (Id. at 42:17-22.)

72.     The Players moved to preclude counsel's "summary" on the ground that it relied upon purported evidence never disclosed to the Players or even presented at the hearing.  (Id. at 24:6-11.) The Commissioner denied the motion.  (Id. at 31:14-22.)

## VIII.  POST-HEARING EVENTS FURTHER DISCREDIT THE COMMISSIONER'S ARBITRATION PROCESS

73.     As described above, the NFL's counsel argued at the hearing that witness statements – never seen or presented to the NFLPA or the Players – purportedly confirmed the Players' participation in the alleged "pay-for-performance/bounty" program.   Many of these witness statements were attributed to Saints Coach Joe Vitt and Mr. Michael Ornstein.  As also described above, the NFL declined to make Coach Vitt, Mr. Ornstein, or any other witness to the alleged events available to testify at the hearing.

74. Following the hearing, Coach Vitt publicly denied the NFL's assertions that he had in any way corroborated or confirmed the allegations against the Players.

75. For example, at the arbitration, the NFL's counsel argued that Exhibit 10 – "contemporaneous handwritten notes" containing no identifying information whatsoever – was evidence that Mr. Smith and Mr. Fujita had contributed money to the "general pool" for the 2009 NFC Championship game. (Ex. T, Goodell Hr'g Tr. at 70:24-71:9.) That same document also indicates that Mr. Vitt contributed $5,000 to the "QB out pool." (Ex. Q, NFL Exhibits at NFLSL00156 (Ex. 10).)

76. Coach Vitt, however, flatly refuted the claim that he ever pledged any money for any type of incentive program for the Saints NFC Championship game against the Vikings, and he called into question both the mysterious authorship and authenticity of Exhibit 10. Mike Triplett, New Orleans Saints coach Joe Vitt expands on denials of NFL claims in interview with Times-Picayune, The Times-Picayune, June 20, 2012.[10] Further, Coach Vitt said that he "never heard a player ever talk about putting Favre out of the game or injuring another player" and that was "exactly what [he] told [NFL] investigators and told the commissioner." Id.

77. Coach Vitt also stressed that it could not "be emphasized enough [that] none of [the Saints] players, particularly those who are facing suspensions, ever crossed the white line with the intent to injure an opponent." Mike Florio, Vitt offers to take lie detector test regarding Favre bounty allegations, NBC ProFootballTalk, June 20, 2012.[11] And, he announced that he had "stated from Day 1 to [NFL] investigators" that Saints players had "done nothing wrong," and that the inflammatory terms used by Coach Williams – such as "cart-offs," "whacks," and "knockouts" – in reality referred

---

[10] http://www.nola.com/saints/index.ssf/2012/06/new_orleans_saints_coach_joe_v_1.html.

[11] http://profootballtalk.nbcsports.com/2012/06/20/vitt-offers-to-take-lie-detector-test-regarding-favre-bounty-allegations/.

to legal hits.  Triplett, <u>Joe Vitt expands on denials</u>, <u>supra</u>.  Coach Vitt even went so far as to suggest that the NFL's documents had been fabricated, given what they had been claimed to indicate.  Mike Florio, <u>Vitt questions whether bounty evidence has been "falsified or tampered with"</u>, NBC ProFootballTalk, June 21, 2012.[12]

78.     Similarly, Mr. Ornstein has refuted claims made by the NFL's outside counsel that he confirmed that Mr. Vilma placed a $10,000 bounty on both Kurt Warner and Mr. Favre during the 2009 NFC playoffs.  (Ex. T, Goodell Hr'g Tr. at 69:18-70:2.); <u>see</u> Mike Florio, <u>Ornstein denies telling NFL that Vilma offered money</u>, NBC ProFootballTalk, June 19, 2012 ("Did I say to the league that I saw Jonathan Vilma offer $10,000?  Absolutely not.").[13]  Instead, according to Mr. Ornstein, he advised the NFL that he "never saw [Mr. Vilma] offer one dime" and that he "never heard [Mr. Vilma] say [that he was placing a bounty on either Mr. Warner or Mr. Favre]."  Florio, <u>Ornstein denies telling NFL</u>, <u>supra</u>.

79.     As another example, at the arbitration, the Commissioner relied upon a video that purportedly showed Mr. Hargrove standing on the sideline of an NFL game saying "give me my money" as supposed evidence of a "bounty" on another player (Brett Favre).  Following the hearing, the Commissioner went so far as to release the video to members of the press.  But serious questions – including by voice experts – have been raised about whether the voice in the video is in fact Mr. Hargrove's, another player's, or something else.[14]  The NFL, of course, has offered no forensic or other evidence to support its claim that Mr. Hargrove made these remarks, which is particularly

---

[12]  http://profootballtalk.nbcsports.com/2012/06/21/vitt-questions-whether-bounty-evidence-has-been-falsified-or-tampered-with/.

[13]      http://profootballtalk.nbcsports.com/2012/06/19/ornstein-denies-telling-nfl-that-vilma-offered-money/.

[14]    http://www.nytimes.com/2012/06/29/sports/football/anthony-hargrove-video-is-key-evidence-in-saints-bounty-scandal.html?_r=2.

egregious given the fact that the same video also shows that Mr. Hargrove did not participate in the "hit" on Mr. Favre that was the supposed subject of the sideline remarks.[15]   And, in his Arbitration Award (discussed below), the Commissioner has now retreated from the claim that the evidence constitutes evidence against Mr. Hargrove.  (Ex. A, Commissioner Arbitration Award at 7 ("I am prepared to assume – as he apparently stated publicly – that [Mr. Hargrove] did not make [the statement on the video].").

80.     These post-hearing developments strongly underscore the grievous harm caused to the Players as a result of the NFL ignoring basic CBA and legal requirements and instead relying on purported evidence that was not properly disclosed, authenticated or presented to the accused Players for any type of meaningful hearing.  Indeed, it becomes more apparent with each passing day that the NFL has chosen to withhold documents and witness statements that would exonerate the Players.

IX.     **THE COMMISSIONER ARBITRATION AWARD IS ISSUED**

81.     Late afternoon on July 3rd, i.e., on the eve of the July 4th holiday, the Commissioner finally issued his award, which merely rubber-stamped his previous imposition of discipline.

82.     The Commissioner wrote in his decision that he had relied upon "the two confidential investigation reports provided to [Plaintiffs/Petitioners]" (i.e., the Security Report and the Memorandum of Decision), which in turn rested upon the 18,000 documents that the NFL had trumpeted but refused to disclose. (Ex. A, Commissioner Arbitration Award at 2; Ex. C, NFL Security Report at 2.)  He also acknowledged that he had "taken into account" the presentation made by the NFL's outside counsel, which relied on scores of additional exhibits – such as witness statements – that the NFL chose not to disclose.  (Ex. A, Commissioner Arbitration Award at 2.)

---

[15]     http://profootballtalk.nbcsports.com/2012/06/20/video-doesnt-prove-that-hargrove-said-give-me-my-money/.

83.     The Commissioner also denied the motion to recuse himself, denied the objection to his jurisdiction and denied all of the objections to the failure to adhere to express and implied CBA and industrial due process requirements.  (Id. at 3-7.)  His purported rationale for denying these motions is addressed below.

84.     Finally, the Commissioner Arbitration Award in several places refers to the Players' decisions not to testify or to otherwise present evidence at the arbitration.  (See, e.g., id. at 4, 8.)  As was stated on the record at the arbitration, the Players made that decision reluctantly.  (Ex. T, Goodell Hr'g Tr. at 16:12-23.)  But given the absence of any semblance of a fair process, the Commissioner's evident bias, and the Players' objections to his exercise of jurisdiction, there was no meaningful ability or purpose for them to participate in the merits of the arbitration.

## ARGUMENT

**I.     THE SHAM ARBITRATION VIOLATES EXPRESS CBA PROVISIONS AND REQUIREMENTS OF INDUSTRIAL DUE PROCESS**

### A.     The Commissioner Arbitration Award Violates The "Essence Of The CBA"

85.     For those limited circumstances in which the Commissioner has arbitral jurisdiction to review discipline imposed on NFL players pursuant to Article 46, Section 1(a) of the CBA, the NFLPA bargained for certain essential CBA protections for players.  As Article 46, Section 2(f)(ii) provides:

> **Discovery.**  In appeals [before the Commissioner], the parties shall exchange copies of any exhibits upon which they intend to rely no later than three (3) calendar days prior to the hearing.  <u>Failure to timely provide any intended exhibits shall preclude its introduction at the hearing.</u>

(Ex. B, CBA, Art. 46, § 2(f)(ii) (emphasis added).)  Thus, any exhibits not disclosed to the NFLPA may not be relied upon by the Commissioner in upholding any discipline.[16]

---

[16] An "exhibit" is broadly understood to mean any "document, record, or other tangible object formally introduced as evidence."  BLACK'S LAW DICTIONARY 655 (9th ed. 2009).

86.     The CBA also gives players the right to be accompanied by counsel of their choosing at any Commissioner arbitration (id., Art. 46, § 2(b)), and the standard form NFL Player Contract appended to the CBA provides that the Commissioner may impose discipline "only after giving the Player the opportunity for a hearing."  (Id., App. A, NFL Player Contract ¶ 15.)  This express CBA provision establishing the right of players to both a hearing and counsel carries with it the implicit guarantee of a fair hearing in which the parties will have access to, at a minimum, exculpatory evidence and the right to confront witnesses to the alleged events.  It would be an absurd and thus unsustainable interpretation of Article 46 to conclude that the NFLPA granted the Commissioner the right to serve as the arbitrator for suspensions and fines of NFL players without a commitment to conducting a fair "hearing" process.[17]   Indeed, if the parties to the CBA had intended that the Commissioner could simply rubber-stamp punishment for "conduct detrimental," it would render a nullity the arbitral "hearing" process for which Article 46 and Paragraph 15 of the NFL Player Contract expressly provide.  (Id., Art. 46 § 2(a); Id., App. A., NFL Player Contract ¶ 15.)

87.     Here, the Commissioner Arbitration Award explicitly rests upon documents and witness statements never disclosed to the NFLPA – a brazen and unequivocal violation of the disclosure protections that the NFLPA collectively bargained for in the CBA.  As such, the Award fails to derive its essence from the CBA and must be vacated.

88.     An arbitral decision fails to draw "its essence from the CBA" if "[t]he remedy 'conflicts with the agreement's express terms.'"  Holmes v. Orleans Parish Sch. Bd., 698 So. 2d 429, 434 (La. Ct. App. 1997) (quoting Int'l Union v. Cincinnati Die Casting, Inc., 807 F. Supp. 68, 70 (S.D. Ohio 1992)); see also Cont'l Airlines, Inc. v. Int'l Bhd. Of Teamsters, 391 F.3d 613, 619-20 (5th Cir. 2004) (arbitral board's interpretation of the parties' agreement failed to construe the

---

[17] In rejecting the NFLPA's procedural objections to the arbitration process, the Commissioner did not – and, of course, he could not – dispute the Players' CBA right to a fair hearing and a fair process.  (Ex. A, Commissioner Arbitration Award at 4-5.)

agreement's plain terms by "read[ing] out" specific requirements and thus did not draw its essence from the parties' agreement).

89.    The "rule in [the Fifth Circuit], and the emerging trend among other courts of appeals, is that arbitral action contrary to express contractual provisions will not be respected" and that "federal courts are free to scrutinize [an arbitration award] to ensure that the arbitrator acted in conformity . . . with the collective bargaining agreement." Delta Queen Steamboat Co. v. Dist. 2 Marine Eng'rs Beneficial Ass'n, 889 F.2d 599, 604 (5th Cir. 1989); see also Int'l Union of Operating Eng'rs v. Cooper Natural Res., Inc., 163 F.3d 916, 920 (5th Cir. 1999) (affirming vacatur because arbitrator disregarded his clear obligations under the contract).   Further, when an arbitrator goes beyond the four corners of the collective bargaining agreement, "vacation or modification of the award is an appropriate remedy," and judicial deference afforded to the arbitrator's ruling "is at an end." Delta Queen, 889 F.2d at 602.

90.    After months of public posturing about the purportedly unprecedented scope of the Commissioner's investigation, three days before the arbitration, the NFL produced a meager sixteen exhibits, totaling less than 200 pages.  But, at the hearing, the League's outside counsel referred to a litany of witness statements, interviews, anonymous handwritten notes, and forensic evidence that was never disclosed to the NFLPA or the Players and that "underlies the disciplinary decisions that the Commissioner" imposed on the Players.  (Ex. T, Goodell Hr'g Tr. at 5:8-14.)[18]   And, the

---

[18] Before commencing her slideshow "summary" of the "evidence" relied upon by the Commissioner, the NFL's outside counsel stated that "the League ha[d] previously disclosed *all* of the exhibits that [it was] going to be referencing in [the] summary." (Ex. T, Goodell Hr'g Tr. at 38:11-16) (emphasis added).)  As reviewed in this motion, NFL outside counsel's self-serving statement that the League had disclosed all the exhibits the Commissioner relied upon in rendering his Arbitration Award was belied by NFL counsel's own presentation and the NFL's own documents setting forth the bases for the discipline (i.e., the Security Report, the Memorandum of Decision, and the Player Discipline Letters).

Commissioner Arbitration Award expressly confirms that he had "taken into account" the presentation by the NFL's lawyer.  (Ex. A, Commissioner Arbitration Award at 2.)

91.    Specifically, the following categories of documents were not disclosed to the NFLPA or the Players but were nevertheless identified by the NFL's outside counsel as "evidence" relied upon by the Commissioner:

- "Contemporaneous handwritten notes" taken during Saints' team meetings (e.g., Ex. T, Goodell Hr'g Tr. at 70:22-25, 83:19);

- Unidentified forensic evidence (e.g., id. at 57:16-59:2);

- Interviews of "knowledgeable source[s]" who "provided [the NFL] with a firsthand account of a pay-for-performance/bounty program" and "corroborating evidence and documents."  (Id. at 41:12-18);

- Interviews of the Saints coaching staff (e.g., id. at 59:15-18);

- Interviews of unnamed sources (e.g., id. at 62:7-22, 78:4-10, 83:16-18), witnesses outside of the Saints' organization (e.g., id. at 63:2-64:2) and of other "firsthand sources" (e.g., id. at 68:11-13); and

- "Other independent evidence from a source present at a meeting in early 2010."  (Id. at 80:16-20.)[19]

92.    The NFL's total disregard for the NFLPA's discovery rights in the Commissioner Arbitration is further underscored by the massive gap between the NFL's proclamations about the expanse of its investigation and the utter paucity of information actually disclosed to the NFLPA and the Players (a one-and-a-half inch binder consisting of sixteen exhibits and mostly irrelevant documents).

93.    Moreover, the Commissioner Arbitration Award expressly rests on the NFL Security Report as a basis for the decision.  (Ex. A, Commissioner Arbitration Award at 2.)  Similarly, the

---

[19] With respect to the interviews conducted at the Commissioner's direction, it is inconceivable that the NFL does not possess interview transcripts, notes, recordings and/or other tangible information concerning these interviews relied upon by Commissioner Goodell.   The NFL has similarly withheld from the NFLPA any transcript made of the Saints coaches' April 5th appeal hearings before the Commissioner.  (See Ex. T, Goodell Hr'g Tr. at 23:13-17.)

Player Discipline Letters specifically refer to the NFL Security Report as "set[ting] forth the key facts relating to the bounty program."  (E.g., Ex. G, Fujita Letter at 1.)  But rather than turn over the "more than 18,000 documents" that underlie the Security Report, the NFL turned over less than 200 pages to the NFLPA in advance of the hearing.  (Ex. C, NFL Security Report at 2.)

94.     The CBA simply does not permit the NFL to make such selective disclosures of documents upon which the Commissioner is plainly relying to impose and review his discipline. Rather, the CBA clearly states that undisclosed exhibits may not serve as the basis for discipline under Article 46.  The NFL's willfully inadequate disclosures, and the Commissioner Arbitration Award's reliance on undisclosed materials, run roughshod over this essential CBA protection for players.

95.     Fifth Circuit precedent confirms that such incongruity between the express terms of the CBA and the NFL's actual disclosures effectively reads the bargained-for discovery and "hearing" provisions out of the CBA, which constitutes a "fail[ure] to arguably construe the agreement[]," and requires vacatur.  See, e.g., Cont'l Airlines, 391 F.3d at 620 ("Because we conclude that the Board's interpretation failed to arguably construe the agreements, we need not address two other issues raised by [plaintiff] as grounds to vacate the award.").  In Continental Airlines, the Court of Appeals reversed the district court and vacated an arbitration award that reinstated an employee for violating a Last Chance Agreement ("LCA")[20] by testing positive for an intoxicant at work.  The Court vacated the award because the arbitrators were found to have "exceeded the scope of [their] jurisdiction" by "failing to require proof of a doctor's order [for the

---

[20] The Fifth Circuit has previously held that a Last Chance Agreement must be afforded the same treatment as a CBA, i.e., it "must be thought of as a supplement to the CBA and is just as binding upon the arbitrator."  Cooper Natural Res., 163 F.3d at 919.  The same treatment is accorded the form of the NFL Player Contract, which here is explicitly incorporated as an "integral" part of the CBA. (See Ex. B, CBA, Art. 70, § 7.)

medicinal drug test trigger]." Id. at 620 (emphasis omitted). The Court found that the arbitrators had violated the "essence of the agreement" by effectively reading a provision out of it.

96.     Similarly, the Court in Cooper Natural Resources affirmed vacatur of an arbitrator's award that disregarded the definition of notice in the parties' LCA. 163 F.3d at 919 ("[A]s to the question whether [grievant] had notice of the [policy] . . . the arbitrator's finding to the contrary ignored the plain language of the contract and involved his engaging in just the sort of 'industrial justice' that the Supreme Court has proscribed."). The Court found that "the arbitrator simply did not have the authority to ignore the parties' agreement in fashioning a remedy, because an award that is contrary to express contractual provisions cannot be sustained." Id. (citation omitted). There, as here, the arbitrator ignored or refashioned a critical part of the bargained-for process:

> By not basing his award in "the essence of the agreement," the arbitrator neglected his duty to follow the "clear requirements" of the parties' negotiated contract[]. Under these circumstances, the arbitration award effectively eliminated the purpose of the [agreement] . . . .

Id. at 920. The Commissioner Arbitration Award similarly, and impermissibly, reads out of the CBA the requirement that only information that is disclosed may form the basis of an arbitral decision by the Commissioner and that a "hearing," conducted with the fairness that the term implies, will be provided to players and their counsel as part of the arbitration process.

**B.      The Players Were Denied Industrial Due Process**

97.     The NFL's refusal to disclose potentially exculpatory documents and to present actual witness testimony also violates the bare minimum standards of fairness and due process required in arbitral proceedings involving employee discipline, further compelling the conclusion that the Commissioner Arbitration Award must be vacated.

98.     Vacatur of an arbitration award is appropriate when the underlying arbitration proceeding is "fundamentally unfair." Gulf Coast Indus. Workers Union v. Exxon Co., USA, 70 F.3d

847, 850 (5th Cir. 1995). A proceeding lacks fundamental fairness when an arbitrator refuses to hear evidence "pertinent and material to the controversy." Id. (vacating award under "pertinent and material" standard in LMRA proceeding because arbitrator refused "to consider evidence of [a] positive drug test"); Murphy Oil USA, Inc. v. United Steel Workers AFL-CIO, Civ. No. 08-3899, 2009 WL 537222, at *3 (E.D. La. Mar. 4, 2009) (vacating arbitral award where arbitrator "strayed" from parties' agreement by failing to conduct an evidentiary hearing and explaining that "[a] fundamentally fair hearing is one that meets the minimal requirements of fairness" including "a hearing on the [pertinent and material] evidence and an impartial decision by the arbitrator"); see also Tempo Shain Corp. v. Bertek, Inc., 120 F.3d 16, 20, 21 (2d Cir. 1997) (concluding that "the panel excluded evidence plainly 'pertinent and material to the controversy,'" which "amounts to fundamental unfairness").

99.     Similarly, disciplinary action by management is routinely reversed where the discipline imposed violates basic notions of fairness or due process. Elkouri & Elkouri, How Arbitration Works 967 (Alan Miles Ruben ed., 6th ed. 2003); Shaefer's Ambulance Serv., 104 Lab. Arb. Rep. (BNA) 481, 486 (1995) (Calhoun, Arb.) (reversing disciplinary action by management where grievant and his union were denied basic process rights, such as the right to confront his accuser). Accordingly, an employee dismissed or suspended without an adequate opportunity to confront his accuser has been deprived of the minimal procedural requirements of industrial due process. See Elkouri & Elkouri, supra at 356 (Kenneth May ed., 6th ed. Supp. 2010) (the right to confront and cross-examine an adverse witness in discipline or discharge cases is a part of arbitral "due process" jurisprudence); see also, e.g., Akron City Hospital, 113 Lab. Arb. Rep. (BNA) 146, 151 (1999) (Chattman, Arb.) ("While a disciplinary process is not subject to the same Due Process protections as in a criminal trial, there exists an industrial version of Due Process that sets the

standards of fair dealing with employees . . . [including] [t]he right of an accused to confront his accusers.") (citation omitted).

100.    Further, at minimum, an employee must be permitted access to any exculpatory evidence in the employer's possession in order to mount an effective defense against unfounded accusations.  See, e.g., Hamilton City Sch. Dist., 122 Lab. Arb. Rep. (BNA) 463, 470-471 (2006) (Dean, Arb.) ("Where an employer denies the union access to potentially exculpatory evidence or destroys such evidence, it will be precluded from exercising its disciplinary authority . . . .").

101.    The Commissioner Arbitration Award makes no mention – much less accounts for – these principles of industrial due process.

          **1.**      **The NFL Deprived the Players Access to Crucial Witnesses**
                    **Upon Whose Statements the Discipline Was Based**

102.    Twice prior to the arbitration, the NFLPA requested that the NFL compel the attendance of, among others, five current and former members of the Saints coaching staff who were the key eye witnesses to the alleged events.  (See Ex. N, June 11 Letter to Goodell; Ex. O, June 14 Letter to Goodell.)  Two of the coaches – Gregg Williams and Joe Vitt – were present at every defensive meeting during the 2009, 2010 and 2011 seasons and were therefore the two primary eye witnesses to the events in question.  Moreover, the NFL's interviews of Coaches Williams and Vitt – which surely were memorialized or recorded – form the purported basis for the very discipline being reviewed.

103.    While the NFL refused to present Coach Williams or Vitt to the NFLPA and the Players for examination, it nevertheless proceeded to rely on their alleged witness statements at the arbitration.  (See, e.g., Ex. T, Goodell Hr'g Tr. at 41:19-42:14).  The NFL had the ability to compel the attendance of both men: Mr. Vitt is an employee of the Saints, one of the 32 clubs in the NFL, and the NFL has exclusive control over whether the ban on Mr. Williams as an NFL coach is ever lifted.  Despite refusing to show the witness statements to the Players, the NFL argued that the

statements supported the discipline by allegedly confirming the Players' participation in a "pay-for-performance/bounty" program.[21]   (Id. at 43:24-44:6, 45:19-46:14, 47:7-11, 48:10-50:8, 56:16-25, 69:18-25, 70:16-18, 81:18-82:7.)

104.   By precluding the Players from confronting their alleged accusers, whose statements the NFL relied upon as a principal basis for the Commissioner's discipline and, accordingly, his Arbitration Award, the Commissioner deprived the Players of their industrial due process rights and issued an Award offending basic notions of fairness.   See, e.g., Chevron-Phillips Chem. Co., 120 Lab. Arb. Rep. (BNA) 1065 (2005) (Neas, Arb.) (reinstating employee because he was denied the opportunity to confront his accusers and answer some of the charges against him); see also Marion Power Shovel Div., 82 Lab. Arb. Rep. (BNA) 1014, 1016 (1984) (Kates, Arb.) ("[I]t is improper for the Company to rely upon the written statement of an employee without presenting his personal testimony, if his presence is requested by the Union and if the party relying upon his written statement has the power to have him appear at the hearing.").

105.   Without any showing of good cause for Mr. Vitt's and Mr. Williams's failure to appear, the NFL should have been precluded from relying on their statements as a basis for the Players' discipline.   See, e.g., Boise Cascade Corp., 114 Lab. Arb. Rep. (BNA) 1379, 1384 (2000) (Crider, Arb.) (finding that industrial due process calls for an employee to be "given the opportunity to face and cross-examine his accusers at the arbitration table; [p]rocedural due process requires the arbitrator disallow the affidavits of witnesses who, without any real showing of good cause, fail to appear and testify at the arbitration").

---

[21] Tellingly, the NFL did compel the attendance of Jeffrey Miller and Joe Hummel at the hearing – two NFL employees who would provide self-serving, hearsay accounts of interviews that the NFLPA and the Players had been precluded from participating in or reviewing.

106.     The deprivation of access to a crucial witness is well-recognized as a basis on which to overturn employee discipline.  <u>See, e.g.</u>, <u>Tempo Shain</u>, 120 F.3d at 20-21 (vacating arbitration award and finding that "panel's refusal to continue the hearings to allow [witness] to testify amount[ed] to fundamental unfairness and misconduct," particularly where "[witness] was identified several times throughout the testimony" and "the documentary evidence did not adequately address such [witness's] testimony"); <u>Marion Power</u>, 82 Lab. Arb. Rep. (BNA) at 1016 (reducing discipline because employer wrongfully relied upon witness's written statement at hearing without producing witness).

107.     Because the NFL made its reliance on the statements of Mr. Vitt and Mr. Williams as a basis for the Players' discipline abundantly clear (Ex. T, Goodell Hr'g Tr. at 82:12-17 ("Mr. Williams also confirmed that Mr. Smith pledged significant sums during the 2009 playoffs"); 76:18-22 ("Gregg Williams stated that Mr. Vilma contributed seed money to the pay-for-performance/bounty kitty"); 48:10-21 ("Mr. Vitt also acknowledged the existence of the program in an interview with NFL investigators . . . .  According to Mr. Vitt, Mr. Williams told the defensive players that the program would reward on-field performance . . . .  This description is consistent with that given by Mr. Williams")), the Commissioner's Award must be vacated.

### 2.     The NFL Denied the Players Access to Exculpatory Evidence

108.     As described above, the NFL rejected out of hand the Players' request for exculpatory evidence on the ground that the NFL needed only to disclose evidence it intended to rely upon at the hearing.  Suffice it to say, the NFL had no intention to rely upon evidence that might exonerate the Players and undermine the Commissioner's investigation and imposition of discipline.

109.     It has become evident that NFL witness statements and NFL-controlled witnesses – and likely much more – would in fact contradict the NFL's charges against the Players.

110.    For example, after being singled out by the NFL's outside counsel as a principal witness corroborating the existence of a "bounty" program, Coach Vitt made public statements flatly contradicting NFL outside counsel's assertions.  He has categorically denied the existence of any "bounty" program or any specific bounty placed on any opposing player during the 2009, 2010 or 2011 NFL seasons by any Saints Player.  Triplett, Joe Vitt expands on denials, supra.  Further, he "could not [] emphasize[] enough [that] none of [the Saints] players, particularly those who are facing suspensions, ever crossed the white line with the intent to injure an opponent."  Florio, Vitt offers to take a lie detector test, supra.  And, most importantly for these purposes, Coach Vitt "stated from Day 1 to [NFL] investigators" that Saints players had "done nothing wrong."  Triplett, Joe Vitt expands on denials, supra (emphasis added).[22]

111.    As another example, Ms. White argued that Michael Ornstein, an eye witness to the events in question upon whose testimony the NFL relied (see, e.g., Ex. T, Goodell Hr'g Tr. at 41:24-42:6), confirmed that Mr. Vilma placed a $10,000 bounty on both Kurt Warner and Mr. Favre during the 2009 NFC playoffs.  (Id. at 69:18-70:2.)  In stark contrast to Ms. White's argument, Mr. Ornstein has since categorically denied making any such statement.  Mike Florio, Ornstein denies telling NFL that Vilma offered money, supra.  Instead, according to Mr. Ornstein, he advised the NFL that he "never saw [Mr. Vilma] offer one dime" and that he "never heard [Mr. Vilma] say [that he was placing a bounty on either Mr. Warner or Mr. Favre]."  Id.

---

[22] Another example of the NFL withholding exculpatory evidence was its initial denial of the NFLPA's request for a sworn affidavit submitted to NFL Security by Duke Naipohn, a consultant who spent nearly the entire 2011 NFL season with the Saints.  (See Ex. P, June 15 Letter to McPhee.)  At first, the NFL claimed it was not in possession of Mr. Naipohn's declaration.  (See id.)  At the arbitration, however, the NFL inexplicably found Mr. Naipohn's affidavit, which completely denied the existence of a "bounty" program at the Saints during the 2011 season.  (See Decl. of Duke Naipohn, attached hereto as Ex. U.)  Although the NFL admitted to finding Mr. Naipohn "credibl[e]," it summarily dismissed his exculpatory testimony because Mr. Naipohn's testimony "was not considered by NFL investigators to contradict the clear recollections of those who actually participated in the program."  (Ex. T, Goodell Hr'g Tr. 63:2-64:24.)

112.    Needless to say, the NFLPA should not have first learned about these exculpatory statements to NFL Security from press reports.  Industrial due process (and the disclosure and "hearing" requirements of the CBA) required the Commissioner to conduct his arbitration according to a higher standard.

113.    <u>In his Award, the Commissioner continued to insist that the Players had no right to exculpatory evidence</u>, but made the blanket statement that "[w]ithout regard to the terms of the CBA, I find no basis whatsoever for the assertion that 'exculpatory evidence' was withheld by the NFL." (Ex. A, Commissioner Arbitration Award at 5.)

114.    That contention, however, is belied by the Commissioner Arbitration Award itself, in which Commissioner Goodell revealed – for the first time – that Coach Vitt's public denials were "<u>consistent with the view that he expressed to NFL investigators and at his appeal hearing</u>:  that 'cart-offs,' 'whacks' and 'knockouts' referred only to 'clean' hits."[23]  (<u>Id.</u> at 7 (emphasis added).)  In other words, the NFL had in its possession all along evidence that these nefarious terms associated with the alleged "pay-for-performance/bounty" system in fact merely related to legitimate plays.  It is not credible for the Commissioner to have made this revelation in his Arbitration Award while simultaneously proclaiming that no such exculpatory information was withheld.  Indeed, Coach Vitt's exculpatory statements to NFL investigators and to the Commissioner himself at Coach Vitt's appeal hearing further beg the question about the expanse of other exculpatory information that was concealed in violation of the Players' industrial due process rights.

### 3.    Commissioner Goodell Improperly Failed to Mitigate the Players' Discipline Under Well-Established Management-Also-At-Fault Principles

115.    Another aspect of the Commissioner's failure to accord the Players their basic industrial due process rights is the absence of <u>any</u> mitigation of their discipline despite the fact that <u>all</u>

---

[23] As noted previously, the NFL did not disclose to the NFLPA any transcript from the Saints coaches' appeal hearings.

the conduct of which the Players have been accused is alleged to have been directed by Saints coaches, i.e., by the Players' immediate supervisors.

116.   It is a recognized principle of industrial due process to require that any employee discipline be commensurate with an employee's share of fault relative to those directly supervising him under the well-named "management-also-at-fault" doctrine.   See Elkouri & Elkouri, supra at 1000-1001 (where "management (ordinarily the supervisor) is also at fault in some respect in connection with the employee's conduct, the arbitrator may be persuaded to reduce or set aside the penalty assessed by management").   "[T]he extent of the supervisor's fault should be measured and weighed against the level of independent wrongful conduct by the employee." Hoosier Energy Rural Elec. Coop., Inc., 126 Lab. Arb. Rep. (BNA) 1083, 1087 (2009) (Murphy, Arb.).   Indeed, discipline should be reduced accordingly even in those cases where an "employee knowingly engages in serious wrongful misconduct, but management is properly charged with a high degree of responsibility for that misconduct." Safeway Stores Inc., 95 Lab. Arb. Rep. (BNA) 63, 69 (1990) (Levak, Arb.).

117.   These principles apply broadly when management had prior knowledge of or had given prior approval of the conduct at issue, tolerated employee misconduct, failed to enforce applicable rules, or had constructive knowledge but still did nothing to stop the conduct.[24]   A fortiori, such principles require vacatur of the arbitral award imposing discipline here, where the NFL found that the conduct at issue was designed and directed by Coaches who were the direct supervisors of the Players on the team.

---

[24]   See, e.g., Tyler Pipe Co., 2004 WL 1184790 (Feb. 27, 2004) (Jennings, Arb.) (overturning discharge and awarding partial back pay due to employer failure to adequately respond to disciplinable conduct); Boeing Airspace Operations, 2003 WL 21029523 at *10 (Mar. 17, 2003) (Howell, Arb.) (reducing discharge to suspension because employer also at fault); Ball-Foster Glass Container Co., 106 Lab. Arb. Rep. (BNA) 1209, 1215-16 (1996) (Howell, Arb.) (overturning discharge based on long-term employer knowledge of employee conduct cited for discharge); Coca-Cola Bottling Co. of N. Ohio, 106 Lab. Arb. Rep. (BNA) 776, 780, 782-83 (1996) (Borland, Arb.) (overturning discharge because of employer leniency with respect to misconduct at issue and reinstating employees without back pay).

118.    Principles of fundamental fairness and industrial due process require that arbitrators account for mitigating factors in their decisions.  See Alfredo Mfg. Corp., 66 Lab. Arb. Rep. (BNA) 1005, 1011 (1976) (Helfeld, Arb.) ("Justice in industrial discipline includes the following criteria which have been considered up to this point: the seriousness of the grievant's breach of discipline, whether the punishment imposed is proportional to the breach, taking into account not only the grievant's misconduct but also any mitigating or extenuating factors . . . .") (emphasis added). Commissioner Goodell simply ignored this duty in his arbitral Award.[25]

119.    Here, the Commissioner's own investigation concluded that the alleged "pay-for-performance/bounty" program was "developed," "administered," "designed," "implemented," and "operated" by Saints coaches.  (See Ex. C, NFL Security Report at 2; Ex. D, Memorandum at 1-2; Exs. G-I, Player Discipline Letters at 1.)   As the Commissioner's Memorandum of Decision concluded:

> Coach Williams acknowledged that he designed and implemented the pay for performance/bounty program with the assistance of certain defensive players . . . . Coach Williams described his role as overseeing recordkeeping, defining payout amounts, deciding who received payouts, and distributing envelopes containing cash to players who "earned" rewards.

(Ex. D, Memorandum at 2.)[26]

120.    Apparently recognizing that management-also-at-fault mitigation is required here, the Commissioner claims in his Arbitration Award that he "took into account the actions of the coaches in reaching [his] findings and determining appropriate discipline."  (Ex. A, Commissioner Arbitration

---

[25] See also Solano Cnty. Sheriff's Dep't, 129 Lab. Arb. Rep. (BNA) 449, 463 (2011) (Reeves, Arb.) ("[I]n evaluating the discipline, I must consider any mitigating or aggravating factors.") (emphasis added); Hamburg Twp., 126 Lab. Arb. Rep. (BNA) 887, 895 (2009) (Block, Arb.) (finding that "there are mitigating circumstances in this case that must be taken into account").

[26] See also Ex. D, Memorandum at 2 (Commissioner finding that Coach Williams "occasionally contributed funds to the pool"); id. at 6 (Commissioner concluding that "it is appropriate to impose discipline on the club . . . .  I believe, and have frequently expressed the view, that clubs – meaning ownership – are responsible for the conduct of their employees").

Award at 6.)  But, bald assertions aside, neither the Commissioner's Player Discipline Letters nor his Arbitration Award identify <u>any</u> leniency to account for the fact that even <u>if</u> the Players had participated in any "pay-for-performance/bounty" system, it would have been at the direction of their coaches.

121.    Indeed, the Commissioner's statements on this issue reflect an express refusal to consider this industrial due process requirement:  "Well I don't buy that Rich – the evidence is quite clear that the players embraced this . . . so I don't think they are absolved from any responsibility because of that."  Interview by Rich Eisen with Roger Goodell, NFL Commissioner (Apr. 24, 2012) (in response to question about how management's involvement would figure into player punishment if the players were doing as they were told).[27]

122.    Similarly, with respect to Mr. Hargrove, the Commissioner asserted that "[t]he vast majority of your eight-game suspension was attributable to your lying to the investigators and to your obstruction of the investigation."  (Letter from Roger Goodell to Anthony Hargrove at 1, June 8, 2012, attached hereto as Ex. V.)  The arbitral record, however, contains undisputed evidence that, whatever Mr. Hargrove told League investigators, it was because <u>his coaches told him to do so</u>. Specifically, Mr. Hargrove has attested that he was instructed by his coaches to deny the existence of any "pay-for-performance/bounty" system when questioned by League investigators.  (<u>See</u> Decl. of Anthony Hargrove ¶ 5, Apr. 13, 2012, attached hereto as Ex. W ("Williams said he was going to . . . and I should deny it, too."); ¶ 7 ("Vitt also told me that I should deny the existence of any bounty or bounty program"); ¶ 8 ("They told me that when the NFL asked me about any bounty or bounty program, I should 'just play dumb.'").)

123.    The NFL's own investigation corroborated Mr. Hargrove's account:    "Other independent evidence from a source present at a meeting in early 2010 supports Mr. Hargrove's

---

[27] <u>See</u> Farrar, <u>Saints close to knowing further punishment</u>, <u>supra</u>.

statement that <u>he was asked to</u> and willingly agreed to falsely deny the existence of the program." (Ex. T, Goodell Hr'g Tr. at 80:16-20 (presentation of NFL outside counsel) (emphasis added).)[28]

124.    Yet, the Commissioner held in no uncertain terms that Mr. Hargrove would not receive any mitigation of his punishment notwithstanding the undisputed fact that his superiors gave him strict instructions about what to tell NFL investigators.  As the Commissioner wrote to Mr. Hargrove:  "Assuming that to be the case, <u>it in no way absolved you</u> from your obligation to cooperate with the investigation . . . ."  (Ex. H, Hargrove Discipline Letter at 2 (emphasis added).)

125.    Because the Commissioner Arbitration Award deliberately casts aside any mitigation under the management-also-at-fault doctrine, it is legally defective for want of industrial due process on this ground as well.

## II.    THE COMMISSIONER'S DECISION TO PARTICIPATE IN A VOCAL PUBLIC DEFENSE OF HIS DISCIPLINE CREATED A RECORD OF EVIDENT PARTIALITY AND BIAS THAT BY <u>ITSELF REQUIRES VACATING HIS ARBITRATION AWARD</u>

### A.    <u>The Fifth Circuit's "Evident Partiality" Test</u>

126.    The Fifth Circuit uses the "evident partiality" standard under the Federal Arbitration Act ("FAA") in LMRA cases to determine arbitrator bias.  <u>See</u> <u>Moore v. Potter</u>, 275 F. App'x 405, 410 (5th Cir. 2008) ("[W]hen reviewing a case involving a CBA and arising under Section 301 [of the Labor Management Relations Act, 29 U.S.C. § 185], courts are not obligated to rely on the [Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 et seq.] but may rely on it for guidance in reviewing an arbitration award."); <u>see</u> also 9 U.S.C. § 10(a)(2).

127.    Because arbitration is a means of alternative dispute resolution, "it is crucial that arbitrators remain, and appear, completely unbiased." <u>United Steel Workers AFL-CIO v. Murphy Oil</u>

---

[28] <u>See also</u> Ex. D, Memorandum at 3, 5 (NFL concluded that Coach Payton met with Coach Williams and Coach Vitt, in advance of their interviews with league investigators and told them, "Let's make sure our ducks are in a row.").

USA, Inc., Civ. No. 09-7191, 2010 WL 3074322, at *4 (E.D. La. Aug. 3, 2010).  Evident partiality is established when an arbitrator exhibits "actual bias at the arbitration proceeding." Weber v. Merrill Lynch Pierce Fenner & Smith, Inc., 455 F. Supp. 2d 545, 549 (N.D. Tex. 2006).  If "a reasonable person would have to conclude that the arbitrator was partial to one party," then evident partiality is established. Id. at 550.  Moreover, if the arbitrator exhibits a "reasonable impression of bias" rising to the level of evident partiality, then an award must be vacated. Dealer Computer Servs., Inc. v. Michael Motor Co., Inc., 761 F. Supp. 2d 459, 465 (S.D. Tex. 2010).  A reasonable impression of bias rises to the level of evident partiality where the facts "create[d] a strong impression that [the arbitrator] had already decided the disputed issues in the [] Arbitration before it began." Id.

128.    The commissioner of a professional sports league is not exempt from these requirements when serving as an arbitrator, and courts have previously vacated arbitration awards when the commissioner fell short of the required standard of impartiality in considering a particular matter. See, e.g., Morris v. New York Football Giants, Inc., 575 N.Y.S.2d 1013, 1017 (Sup. Ct. 1991) (removing NFL Commissioner as arbitrator where plaintiffs demonstrated "evidence of lack of neutrality and 'evident partiality' and bias on the part of the Commissioner with respect to this specific matter"); Erving v. Virginia Squires Basketball Club, 468 F.2d 1064, 1067, 1068 n.2 (2d Cir. 1972) (rejecting claim that court "had no power to direct the substitution of a neutral arbitrator for the disqualified Commissioner of the American Basketball Association" as "typical of other attempts to emasculate arbitration procedures under the federal act" and noting that "[t]his ruling in favor of a neutral arbitrator was, of course, designed to insure a fair and impartial hearing").

### B.    Commissioner Goodell Willfully Abandoned His Obligation To Act As An Arbitrator Without Evident Partiality

129.    From the moment the so-called "bounty" allegations surfaced, Commissioner Goodell acted in complete derogation of his obligation to act without evident partiality.  Rather than showing any concern for his duty to conduct the arbitration proceedings without evident partiality, the

Commissioner – and his subordinates at the NFL who acted under his direction – repeatedly used the media to attack the Players, presume their guilt, and convict them in the press without any regard for a fair consideration of the facts and the applicable rules.  Instead of fulfilling his arbitral duties, Commissioner Goodell and his subordinates embarked on a comprehensive publicity campaign against the Players, making it clear that their fair treatment would take a back seat to what the Commissioner considered to be the greater interests of the NFL.  By choosing to engage in this public defense of the discipline, Commissioner Goodell rendered himself incapable of serving as an arbitrator without evident partiality.

130.    Instead of stepping back from public commentary about the discipline he intended to impose – as one would expect from an arbitrator who did not want to be viewed as evidently biased – Commissioner Goodell determined to consider the NFL's priorities first, and put the world on notice of his intention to use the arbitral proceedings as part of a PR campaign rather than as a method by which to ascertain the facts and apply the rules:  "It was clear to me when we discovered there was a bounty program that we had to take a strong stand.  People need to understand its [sic] not acceptable in football, it's not part of football in any part of the game.  We made it clear we weren't going to accept it.  We wanted to make sure if anybody decided this was the way to go they understood the consequences were very real."  <u>Intersport Activation Summit: Roger Goodell Sits For A Wide-Ranging Q&A</u>, Sports Business Daily, June 1, 2012.[29]

131.    The Commissioner, and those acting under his direction, continued to act as PR spokesmen defending the Players' discipline, and pronouncing their guilt, throughout the proceedings, with the Commissioner choosing to serve as an advocate for the public image of the NFL rather than as an arbitrator without evident partiality and with a duty to find the facts:

---

[29]    http://www.sportsbusinessdaily.com/Daily/Issues/2012/06/01/Events-and-Attractions/Goodell-interview.aspx.

- The "punishment is designed to let people know that we are going to hold them accountable and responsible for what goes on in their organizations . . . . [N]ot only on the team level but also with the players."  Interview by Adam Schefter with Roger Goodell, NFL Commissioner (Mar. 21, 2012);[30]

- "A combination of elements made this matter particularly unusual and egregious, . . . [and] a strong and lasting message must be sent that such conduct is totally unacceptable and has no place in the game."  Press Release, NFL, NFL announces management discipline, supra.

- "I don't think we can be too hard on people who put at risk our players' health and safety.  That is a critical issue for us . . . .  We will always protect that."  Interview by Rich Eisen with Roger Goodell, NFL Commissioner (Mar. 21, 2012);[31]

- Discipline "is important because it reinforces that there is a shared accountability here . . . Players were clearly participants and clearly have a share of the responsibility and accountability here as well."  Larry Holder, Pash: Saints players clearly participated in bounty scandal, CBS Sports, Apr. 20, 2012 (Jeff Pash, NFL General Counsel, speaking on behalf of the Commissioner);[32]

- "I think one of the things that's made the NFL great is we've solved our own problems . . . I believe that our process has worked.  We've modified those processes . . . .  But we do want to make sure that at every point we uphold the standards that our fans expect."  Commissioner Goodell confident that bounty hunting no longer issue, SI.com, May 31, 2012.[33]

132.   Each of these statements to the media created the public impression that Commissioner Goodell had predetermined that he would severely punish the Players and validate his investigation, regardless of any defense or explanation the Players might make.

133.   The Commissioner, having made such public statements (either personally or through his spokesmen), put himself in no position to be viewed as an impartial arbitrator of the Players' discipline, even if he was subsequently, on appeal, presented with all the exculpatory evidence in the

---

[30] http://www.blogandtackle.net/2012/03/21/nfl-commissioner-roger-goodell-interviews-on-nfl-network-and-espn-march-21/.

[31] http://www.blogandtackle.net/2012/03/21/nfl-commissioner-roger-goodell-interviews-on-nfl-network-and-espn-march-21/.

[32] http://www.cbssports.com/nfl/rapid-reports/post/18717082.

[33] http://sportsillustrated.cnn.com/2012/football/nfl/05/31/roger.goodell.bounty.ap/index.html.

world.  Morris, 575 N.Y.S.2d at 1016-17 (finding "evident partiality" because "[t]o find for plaintiffs herein, the Commissioner would have to reverse certain positions he previously strongly advocated, and declare non-binding or void a certain directive he, through his office, issued to NFL clubs").  Perhaps that is why the Players' requests for exculpatory information were categorically denied.

134.  Commissioner Goodell's statements to the media show partiality that is "direct, definite and capable of demonstration," and leave no doubt that the outcome of the arbitration was determined before it began.  Perhaps most egregiously, Goodell publicly proclaimed the Players' guilt before the arbitration was even held:  "[T]he evidence is quite clear that the players embraced this.  They enthusiastically embraced it.  They put the vast majority of the money into the program and they actually are the ones playing the game."  Interview by Rich Eisen with Roger Goodell, NFL Commissioner (Apr. 24, 2012);[34] see also Press Release, Four Players Suspended, supra ("The evidence clearly showed that the players being held accountable today willingly and enthusiastically embraced the bounty program.").  It is well settled that an arbitrator's conduct creates a "reasonable impression of bias" and rises to the level of "evident partiality" where there is "a strong impression that [the arbitrator] had already decided disputed issues" before the arbitration began.  Dealer Computer, 761 F. Supp. 2d at 465.

135.  Indeed, Goodell himself publicly announced before the appeal hearing that the discipline he imposed on the Players was "unprecedented" and was done specifically with the purpose of sending a message to other players, telling the media, "I hope by the actions that have been taken here that the fact that we discovered it, and the fact that we penalized it with unprecedented discipline, and by the focus that it's gotten, that people understand not to engage in that."  King, Analyzing Tomlinson's career, supra.  Goodell had determined to use the media as a

---

[34] Farrar, Saints close to knowing further punishment, supra.

megaphone to send a message, and either forgot or ignored his obligation to act as an arbitrator without evident partiality in the appeal.

136.    The Commissioner's PR campaign surrounding the punishment of the Players reached new heights when the Commissioner retained a former U.S. prosecutor to conduct a purportedly "independent" review of the evidence underlying the discipline from a supposedly "neutral" standpoint, and then conduct press conferences with the media defending the discipline.[35]  Before the arbitration hearing, Ms. White touted: "In terms of am I independent, the answer is yes I am.  Indeed, my task was, although retained by the NFL, to do an independent review of the evidence and the process in order to ensure that it was clearly the case, based on my review, that there was strong evidentiary support and that the process being followed was thorough and fair."  (Ex. L, Tr. of Player Discipline Conference Call at 3-4 (emphasis added).)  But the facts clearly show otherwise.

137.    Ms. White publicly put her rubber stamp of approval on the Commissioner's decision in press events held long before the arbitration occurred.  (Id. ("It is an unusually strong record on which the commissioner acted.") ("[T]he factual basis for the sanctions is quite strong in my opinion.").)  After this PR campaign, in which the Commissioner publicly locked himself into a conviction of the Players, and in which any reversal would be profoundly embarrassing to Goodell and the NFL, the Players' opportunity for a fundamentally fair hearing before an impartial arbitrator had already been extinguished.  Steve Wyche, 'Bounty' evidence warranted harsh penalties, says ex-attorney, NFL.com, May 3, 2012 (Ms. White stating:  "In my life as a prosecutor, I've had a lot less [evidence] . . . to obtain a conviction.  So no question about how solid the evidence is.").[36]

---

[35] Moreover, any claim by Goodell claiming that he acted impartially is inherently self-serving and legally irrelevant.  See, e.g., Hunt v. Mobil Oil Corp., 654 F. Supp. 1487, 1499-1500 (S.D.N.Y. 1987) ("This self-serving categorical denial of partiality or bias, of course, is neither controlling nor dispositive of the issue; nor is it considered by the Court.").

[36]    http://www.nfl.com/news/story/09000d5d828d6d4a/printable/bounty-evidence-warranted-harsh-penalties-says-exattorney.

138.    It would have been one thing to use public relations to defend the Commissioner Arbitration Award _after_ it was decided and _after_ the Players had a chance to defend themselves. Instead, the Commissioner treated the arbitration as a public theatre in which the guilt of the players would be publicly proclaimed – to promote the interests of the NFL – regardless of the Commissioner's duty as an arbitrator to conduct himself and the proceedings without evident partiality.

139.    Even after the appeal hearing, while the record remained open, the NFL, which acts at the direction of the Commissioner, continued its PR campaign against the Players.  See, e.g., Ex-Saint Anthony Hargrove says it's not his voice in clip, SI.com, June 20, 2012 (NFL spokesman Greg Aiello: "We stand by the findings of our investigation.").[37]  And, a mere two days after the appeal hearing – again before the proceedings were final – Commissioner Goodell held a press event in Washington, D.C. about the bounty controversy after meeting with Senator Richard Durbin of Illinois.  He assured the senator of all the steps he had taken to curb the alleged behavior, including the imposition of the very player discipline he was in the process of arbitrating.  Senator meets with Roger Goodell, calls off bounty hearing, ESPN.com, June 20, 2012 (Durbin:  "What I hear from them now is, it's going to be clear:  The actions that have been taken against some are going to be taken against others if they violate these basic rules that are being established . . . .  What more could I accomplish with a law?  This is better.").[38]

140.    Given this PR campaign, which had pre-determined the guilt of the Players and continued unabated even while the arbitration was being conducted – with both the Commissioner and his subordinates making repeated public comments justifying the discipline imposed on the

---

[37] http://sportsillustrated.cnn.com/2012/football/nfl/06/19/anthony.hargrove.ap/index.html.

[38] http://espn.go.com/nfl/story/_/id/8078411/senator-meets-roger-goodell-calls-bounty-hearing.

Players, before the arbitration had concluded – there is no question that "a reasonable person would have to conclude that the arbitrator was partial to one party."[39] <u>Weber</u>, 455 F. Supp. 2d at 550.

141.    It is thus not surprising that courts routinely disqualify judges for comments far less egregious than those made by Goodell.  <u>See, e.g.</u>, <u>In re Boston's Children First</u>, 244 F.3d 164, 170 (1st Cir. 2001) (disqualifying judge for comments to a reporter that the case before her was "a more complex case" than another case the reporter had described and holding that "the very rarity of such public statements, <u>and the ease with which they may be avoided</u>, make it more likely that a reasonable person will interpret such statements as evidence of bias") (emphasis added).  In <u>United States v. Cooley</u>, for example, the Tenth Circuit ordered disqualification of a judge presiding over criminal trials for abortion protesters because the judge had appeared on "Nightline" prior to the protests to discuss his preliminary injunction ordering that the abortion clinics remain open.  1 F.3d 985, 990, 995 (10th Cir. 1993).  The appellate court held that "in deliberately making the choice to appear in such a forum at a sensitive time to deliver strong views on matters which were likely to be ongoing before him," the judge "unavoidably created the appearance that [he] had become an active participant in bringing law and order to bear on the protesters, rather than remaining as a detached adjudicator."  <u>Id.</u> at 995; <u>see also</u> <u>Broadman v. Comm'n on Judicial Performance</u>, 18 Cal. 4th 1079, 1104 (1998) ("By making public comments in an attempt to justify and defend his decisions while

---

[39] Indeed, one need look no further than actual public perception to confirm this conclusion.  <u>See, e.g.</u>, Mark Kreidler, <u>Explaining Roger Goodell's actions</u>, ESPN.com, March 23, 2012 http://espn.go.com/espn/commentary/story/_/id/7721921/nfl-concussion-issue-explains-roger-goodell-harsh-saints-punishment ("Goodell was bound to go for the most severe discipline he thought he could impose because anything less would be at odds with the other actions he has taken as commissioner when it comes to guys getting their blocks knocked off.  Not only that, but Goodell, acting in the best interests of the league he represents, has to be able to establish that the NFL is doing everything it can to address the problem."); Patrick Michael, <u>Roger Goodell is Losing Control as Flawed Bounty Evidence Continues to Be Found: Fan's Opinion</u>, Yahoo! Sports, June 21, 2012, http://sports.yahoo.com/news/roger-goodell-losing-control-flawed-bounty-evidence-countinues-032800059--nfl.html ("Roger Goodell is now trying to prove that he is right instead of trying to get it right.").

those decisions were pending on appeal, petitioner adopted the role of an advocate.  Such actions would appear to an objective observer to be 'prejudicial to public esteem for the judicial office.'").

142.    Although Commissioner Goodell served as an arbitrator, and not a judge, the same conclusion applies to the Commissioner's "deliberately making the choice" to publicly defend his disciplinary action prior to, and even during, the proceedings before him.  That choice "conveyed an uncommon interest and degree of personal involvement in the subject matter."  Boston's Children First, 244 F.3d at 169; see also In re IBM Corp., 45 F.3d 641, 643-44 (2d Cir. 1995) (disqualifying judge who had presided over an antitrust decree for nearly 30 years due to, *inter alia*, comments by the judge in a newspaper article critical of one of the parties).

143.    In his Arbitration Award, the Commissioner gave short shrift to the NFLPA's objection to his evident partiality, concluding that the NFLPA agreed that "prior announcement of the basis for discipline cannot render the Commissioner incapable of hearing an appeal due to the appearance of bias."  (Ex. A, Commissioner Arbitration Award at 3.)  That cursory assertion misses the point.  To be clear, the NFLPA is not arguing that the Commissioner is rendered impermissibly biased in every case in which he arbitrates his own imposition of "conduct detrimental" discipline.  Rather, the NFLPA's position is that the Commissioner's own conduct in this particular case – the sheer volume of his press interviews, coupled with his countless statements in support of "uphold[ing] the standards that [NFL] fans expect," and leaving "a strong and lasting message," – unquestionably tainted the arbitral process and deprived the Players of their bargained-for right to arbitrate their disciplinary appeal before an arbitrator free of evident partiality.  The Arbitration Award, however, does not even acknowledge the Commissioner's public relations campaign.

III.   **THE COMMISSIONER ARBITRATION AWARD MUST**
       **BE VACATED FOR THE ADDITIONAL REASON THAT**
       **THE COMMISSIONER LACKED ARBITRAL AUTHORITY**

144.   The NFL concedes that an arbitrator has no power absent the parties' agreement to grant him jurisdiction over a particular dispute.  (Non-Injury Grievance Pre-Hr'g Br. of NFLMC at 11, May 14, 2012, attached hereto as Ex. X (citing Elkouri & Elkouri, supra at 285 (arbitrators must be "aware of the limitations of their authority and scrupulously try to avoid any transgression of those limitations"); In re Honeywell, Inc., 116 Lab. Arb. Rep. (BNA) 707, 709-10 (2001) (Duff, Arb.) (arbitrator must dismiss grievance where agreement does not give him jurisdiction to decide dispute)).)[40]

145.   Here, the parties' CBA does not permit the Commissioner to punish or arbitrate with respect to alleged agreements between players and a Club involving non-contract payments.  Instead, the CBA lays out a carefully bargained-for structure in which the Commissioner's power to arbitrate player discipline is limited to certain "conduct detrimental" behavior, such as gambling on NFL games or criminal activity by NFL Players.  (Ex. B, CBA, Art. 46, § 1(a); see Ex. K, System Arbitration Award at 9 (acknowledging the Commissioner's limited jurisdiction:  the Commissioner's "claims of power to discipline for conduct detrimental" should "not be permitted to" go beyond Article 46 and "subvert protections for players won in the collective bargaining process").)

146.   The limited agreement by the NFLPA to have the Commissioner arbitrate certain discipline issues with respect to players does not provide the Commissioner with any authority to

---

[40] In the Article 46 context, the Commissioner serves as an arbitrator.  See Nat'l Hockey League Players Ass'n v. Bettman, No. 93 Civ. 5769, 1994 WL 738835, at *27 (S.D.N.Y. Nov. 9, 1994) ("It is true that the relationship between [Commissioner] Bettman and [player] Sather was, in one respect, different from the ordinary arbitrator-party relation . . . .  Nonetheless this relationship does not undermine [Commissioner] Bettman's capacity to sit as an arbitrator in these disputes . . . ."). The NFL has already acknowledged this.  (Tr. of Non-Injury Grievance Hr'g at 42:20-22, In re New Orleans Saints, (May 16, 2012) (NFL counsel referring to the Commissioner as an "arbitrator" in the discipline context), attached hereto as Ex. Y.)

arbitrate, or even impose discipline, in the very different situation in which players are alleged to have entered into agreements with coaches or their Club regarding non-contract payments. In the latter situation, the parties expressly agreed in the CBA that such disputes fall within the exclusive arbitral jurisdiction of the neutral System Arbitrator. (Ex. B, CBA, Art. 14, § 1; id., Art. 15, § 1.)

147.   Despite the fact that the NFLPA never agreed that the Commissioner could serve as the arbitrator or disciplinary authority in alleged "pay-for-performance" cases, the Commissioner acted in excess of his prescribed authority, usurping the exclusive arbitral jurisdiction of the System Arbitrator to punish players. In these circumstances, even though the jurisdictional issue was initially determined by an arbitrator (System Arbitrator Burbank), the Court must review the jurisdictional basis of the Commissioner's arbitration award de novo and vacate it if the Court finds there was no agreement by the NFLPA to arbitrate this conduct before the Commissioner. See, e.g., Nat'l Basketball Ass'n v. Nat'l Basketball Players Ass'n, No. 04 Civ. 9528(GBD), 2005 WL 22869, at *2 n.5 (S.D.N.Y. Jan. 3, 2005) ("[T]he only issue before this Court is the Grievance Arbitrator's jurisdiction to review and issue an award in this case. . . . Accordingly, this Court reviewed the issue of the Grievance Arbitrator's jurisdiction using a de novo standard without deference to the Grievance Arbitrator's findings regarding his jurisdiction."); see also Delta Queen, 889 F.2d at 602 ("[W]here the arbitrator exceeds the express limitations of his contractual mandate, judicial deference is at an end. Thus, since this jurisdictional challenge focuses upon whether the award is grounded in the bargaining agreement, we will review the district court's decision de novo."); Davis v. Chevy Chase Fin. Ltd., 667 F.2d 160, 165 (D.C. Cir. 1981) ("[A]n arbitral award regarding a matter not within the scope of the governing arbitration clause is one made in excess of authority, and a court is precluded from giving effect to such an award."). Indeed, the NFL has itself conceded that the issue of arbitral jurisdiction and the scope of the agreement for the Commissioner to arbitrate certain limited disputes is ultimately for the Court to decide – not the arbitrators. (Ex. X, Pre-Hr'g Br. of

NFLMC at 2 n.1 (citing <u>AT&T Techs., Inc. v. Commc'ns Workers of Am.</u>, 475 U.S. 643, 649 (1986) ("[T]he question of whether the parties agreed to arbitrate is to be decided by the court[s], not the arbitrator.")).)

148.    In his decision deferring jurisdiction to the Commissioner, the System Arbitrator properly acknowledged that (i) Article 14, Section 1 "contemplates and prohibits an undisclosed agreement or understanding between a player and a Club concerning the player's compensation;" (ii) the Saints Club was involved "if not in paying, then in 'ma[king] available' amounts from the pool," and (iii) the involvement of multiple players "does not insulate the scheme at issue here from Article 14's prohibition, if it is otherwise applicable, since the prospect of and criteria for receiving distributions from the pool could be deemed an 'undisclosed . . . inducement[] . . . or understanding[]' for all players regarding payments that would be made available by the Club, acting through coaches."  (Ex. K, System Arbitration Award at 6.)

149.    The only reason that the System Arbitrator declined to exercise his exclusive arbitral jurisdiction over Article 14 was his erroneous conclusion that there is a "distinction" between players "funding the pool or making offers or pledges to contribute sums to it, on the one hand, and accepting (or agreeing to accept) distributions from it, on the other."  (<u>Id.</u> at 7.)  Specifically, the System Arbitrator determined that Article 14, Section 1 prohibits the <u>acceptance</u> of undisclosed payments from a pool, but not player <u>contributions</u> or pledges to the pool.  (<u>Id.</u>)  He therefore found that he did not have jurisdiction to arbitrate the discipline imposed on the Players because the Commissioner indicated that the discipline concerned Players allegedly paying money into, not receiving money out of, the pool.

150.    Such a distinction with respect to arbitral jurisdiction cannot be found anywhere in the CBA, and the System Arbitrator cited nothing to support it.  Instead, Article 14, Section 1 contains a blanket prohibition against <u>all</u> undisclosed, non-player contract agreements "involving consideration

of any kind to be paid, furnished or made available or guaranteed to the player."[41]   As the alleged conduct at issue falls squarely within Article 14 of the CBA, the agreement to arbitrate was clearly for the System Arbitrator, who has exclusive jurisdiction to arbitrate any disputes of player conduct under Article 14.  (See Ex. B, CBA, Art. 15, § 1 (expressly granting the System Arbitrator exclusive jurisdiction over Article 14 disputes).)

151.    It is well-established that the agreement of the parties to a CBA must be given its full effect and not rewritten by the arbitrator or even the Court.  See White v. NFL (Hobert-Grbac), 972 F. Supp. 1230, 1236 (D. Minn. 1997) ("[A] court may not rewrite into a contract conditions the parties did not insert or, under the guise of construction, add or excise terms.").  Here, it is clear that the NFLPA's agreement to Commissioner arbitration is limited to one section of Article 46.  It is equally clear that there is no CBA basis to conclude that the Commissioner has any jurisdiction to arbitrate a dispute concerning player discipline for alleged violations of Article 14's prohibition on non-contract bonuses – an arbitral subject expressly and exclusively delegated to the System Arbitrator in Article 15 of the CBA.  (See Ex. B, CBA, Art. 15, § 1.)

152.    Further, the NFL's own documents setting forth the bases for the Players' discipline – i.e., the Security Report, the Memorandum of Decision, and the Player Discipline Letters – are unambiguous that "pay-for-performance" is at the heart of the punishments imposed.  So is the Commissioner's Arbitration Award.[42]  This is critical.  Once it is clear that the conduct at issue is subject to Article 14, there can be no debate that the NFLPA agreed to have the System Arbitrator – not the Commissioner – arbitrate any discipline.  Indeed, Article 14 specifically exempts players from

---

[41] The distinction, in fact, is inconceivable given that a Club is subject to punishment under Article 14, see Ex. B, CBA, Art. 14, § 6(b), but a Club would never receive a non-contract bonus; it would only pay one.

[42] For example, the Commissioner wrote, with respect to Coach Vitt's statements that "cart-offs," "whacks," and "knockouts" referred only to "clean" hits, that Coach Vitt was nevertheless corroborating a "pay-for-performance" system.  (Ex. A, Commissioner Arbitration Award at 7.)

the definition of "Club personnel" who may be disciplined by the Commissioner for violating the non-contract bonus provisions.  (Id., Art. 14, § 6(b) ("For purposes of this Subsection 6(b), the term 'Club personnel' shall not include players.").)

153.    Even if the System Arbitrator's erroneous distinction between funding the pool and taking money out of the pool had any significance under the terms of the CBA (it does not), the Player Discipline Letters clearly establish that funding the pool was not the only conduct for which the discipline was imposed.  (See, e.g., Ex. I, Smith Discipline Letter at 2 ("[Y]our active participation in the bounty program, role in its establishment and funding, and the offer of significant sums toward the program pool, all constitute conduct detrimental.") (emphasis added).)  Thus, even under the System Arbitrator's erroneous interpretation of Article 14, the Commissioner's discipline was based, at least in part, on participation in the "pay-for-performance/bounty" program itself, including alleged improper payments for "legitimate plays" and violent hits alike.  As such, there is no conceivable theory under which the NFLPA agreed to have the Commissioner arbitrate such issues.  Without an agreement to arbitrate a particular dispute before the Commissioner, his Arbitration Award must be set aside.

154.    As noted above, the NFLPA has appealed the System Arbitrator's ruling on jurisdiction to an arbitration Appeals Panel provided for System Arbitrations in the CBA.  However, because the Commissioner refused to delay his arbitration until after the Appeals Panel could be selected and hear this issue, the Commissioner Arbitration Award has necessitated that the NFLPA present this issue now to the Court for its de novo review.  As both parties agree, only the Court can finally decide whether the scope of the NFLPA's agreement to arbitrate certain disputes before the Commissioner extends to the player conduct and discipline at issue here.

155.    Without an agreement to arbitrate these issues before Commissioner Goodell, the arbitration must be set aside as the agreement of all parties to arbitrate is essential to any arbitral

award.  <u>AT&T</u>, 475 U.S. at 648 ("[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.").

## COUNT I

## VACATUR OF ARBITRATION AWARD

156.    Plaintiffs/Petitioners repeat and re-allege Paragraphs 1-155 as if set forth fully herein.

157.    Plaintiffs/Petitioners move to vacate the award issued by Commissioner Goodell on July 3, 2012.

158.    The Commissioner Arbitration Award fails to draw its essence from the CBA and, additionally, is the product of a process that violated requirements of industrial due process and fundamental fairness.  The Award should be set aside for each of these independent reasons.

159.    The Award must also be vacated because Commissioner Goodell demonstrated a "reasonable impression of bias" rising to the level of "evident partiality."  <u>Dealer Computer</u>, 761 F. Supp. 2d at 465.

160.    Finally, the Commissioner Arbitration Award must be set aside for the additional reason that the NFLPA did not agree to have the Commissioner arbitrate this type of player dispute, and the Commissioner had no jurisdiction to conduct such an arbitration under the express terms of Articles 14 and 15 of the CBA.

WHEREFORE, in accordance with Section 301 of the LMRA, 29 U.S.C. § 185, Plaintiffs/Petitioners request that this Court vacate the Commissioner Arbitration Award or, in the alternative, vacate the Commissioner Arbitration Award and select a neutral arbitrator to arbitrate the purported discipline, and grant such other and further relief as the Court may deem just and proper.

Respectfully submitted this 5th day of July, 2012,

New Orleans, Louisiana,

/s/  Joseph N. Mole
Joseph N. Mole (Bar No. 9538)
**FRILOT L.L.C.**
1100 Poydras Street, Suite 3700
New Orleans, Louisiana 70163
Telephone: (504) 599-8006
Facsimile: (504) 599-8106
jmole@frilot.com
*Attorney for Plaintiffs/Petitioners*

Jeffrey L. Kessler  (*Of Counsel*)
David G. Feher  (*Of Counsel*)
David L. Greenspan  (*Of Counsel*)
**WINSTON & STRAWN LLP**
200 Park Avenue
New York, New York 10166
Telephone: (212) 294-6700
Facsimile: (212) 294-4700
jkessler@winston.com
dfeher@winston.com
dgreenspan@winston.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 5th day of July, 2012, a copy of the above and foregoing was served by electronic mail upon the following known counsel for the National Football League, Roger Goodell, and Jonathan Vilma in the underlying arbitration proceeding and in related matters:

Gregg H. Levy, Esq.
Benjamin C. Block, Esq.
**COVINGTON & BURLING LLP**
1201 Pennsylvania Avenue NW
Washington, D.C. 20004
Telephone: (202) 662-5292
*Attorneys for National Football League*

Daniel L. Nash
**AKIN GUMP STRAUSS HAUER & FELD, LLP**
Robert S. Strauss Building
1333 New Hampshire Avenue, NW
Washington, DC 20036
Telephone: (202) 887-4067
*Attorney for National Football League*

Jeff Pash, General Counsel
Adolpho Birch III, SVP Labor Counsel
**NATIONAL FOOTBALL LEAGUE**
345 Park Avenue
New York, NY 10154
Telephone: (212) 450-2399
*Attorneys for National Football League*

Conrad S. P. Williams, III
**WILLIAMS LAW GROUP**
Maison Grand Caillou
Corporate Office Park
435 Corporate Drive, Suite 101
Houma, LA 70360
Telephone: (985) 876-7595
*Attorney for Jonathan Vilma*

Lynn. E. Swanson
**JONES, SWANSON,
HUDDELL & GARRISON, LLC**
Pan American Life Center
601 Poydras Street, Suite 2655
New Orleans, LA 70130-6004
Telephone: (504) 523-2500
*Attorney for Roger Goodell*

/s/  Joseph N. Mole
Joseph N. Mole (Bar No. 9538)